CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

OCT 2 6 2015

JULIA C. DUDLEY, CLERK
BY: *J. Clark*
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

|                                     |   |                                                      |
|-------------------------------------|---|------------------------------------------------------|
| UNITED STATES OF AMERICA            | : |                                                      |
|                                     | : |                                                      |
| v.                                  | : | Case No. _1:15CR33_                                  |
|                                     | : |                                                      |
| STACEY POMRENKE                     | : | Violations: 18 U.S.C. §§ 371, 666, 1001, 1343,       |
| a/k/a Stacey Bright                 | : | 1349, 1951                                           |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

1.    On or about November 1951, the City of Bristol, Virginia established the Bristol

Virginia Utilities Board as a city agency to be a provider of utility services, including electric

power, water, and sewer, to the residents of the City of Bristol, Virginia.

2.    On or about July 1, 2010, Bristol Virginia Utilities Board became Bristol Virginia

Utilities Authority, a state authority of the Commonwealth of Virginia.

3.    At times relevant to the Indictment, Companies #1 through #9, operated as

contractors or vendors for Bristol Virginia Utilities Authority or its predecessor Bristol Virginia

Utilities Board (both entities hereafter collectively referred to as "BVU").

4.    In each of the calendar years 2008 and 2009, the City of Bristol, Virginia,

received more than $10,000.00 in federal funds.

5.    In each of the calendar years between 2010 and 2014, BVU received more than

$10,000.00 in federal funds.

6.    STACEY POMRENKE was hired as Chief Financial Officer of Bristol Virginia

Utilities Board on or about March 10, 2003.  At all times relevant to this Indictment, STACEY

1

POMRENKE served as Chief Financial Officer of BVU, which was physically located at 15022 Lee Highway, Bristol, Virginia.

7.      On or about October 18, 2008, Wes Rosenbalm, CEO of BVU, sent an email to STACEY POMRENKE and other employees of BVU directing them to contact vendors and contractors of BVU to tell them to pay money to the Bristol Chamber of Commerce to become members of the Bristol Chamber of Commerce.  At this time, Wes Rosenbalm was an officer of the Bristol Chamber of Commerce.  The email stated, in part:

> *These people/organizations make allot of money off of BVU and they need to return the favor.  I strongly suggest that each one join to help the Chamber which in turn helps BVU more than you can imagine within the business community. . . [i]f a company does regular business with BVU they need to join. . . [i]t goes without saying but I am going to say it we have been good to these companies they need to return the favor to us and it will cost very little money to do so.*

8.      On or about October 22, 2008, at 10:57 a.m., STACEY POMRENKE sent an email to an employee of Company #9, which stated, in part:

> *Hello [employee],*
> *As you may know Wes is president of the Chamber this year and they are on their membership campaign, so, of course, I have been tagged to help out.  Is there anyway your firm could increase your membership from its current status of an annual rate of $461 to $1382 and become a Gold Member?  We certainly would appreciate it!  Just let me know.*

9.      On or about June 1, 2009, Wes Rosenbalm sent an email to STACEY POMRENKE and others stating, in part:

> *[Company #4] is coming in today and I need to hit them up with the sponsorship requests we discussed.  I recall the kids Christmas part (sic) but what else do we need sponsors for?  What do we normally spend on the Christmas part (sic) for the kids?  What do we spend on our Christmas party?  What else was there?  I am meeting with them at 2 so please get back to me quickly.*

10.     On or about July 6, 2009, STACEY POMRENKE sent an email from Bristol, Virginia to Atlanta, Georgia to Employee #1 of Company #5 which stated, in part:

> *Subject: I have tried reaching you.....*
>
> *another question for you – in the negotiations you had mentioned that you had very good seats for Keenland. I know they race again in October – would you have room for some people from Bristol and MIC?*

11.     On or about July 23, 2009, Bristol Virginia Utilities Employee #1 ("BVU Employee #1), at the direction of Wes Rosenbalm and STACEY POMRENKE, sent an email from Bristol, Virginia to Company #1, located in Charlotte, NC, and also sent a copy of the email to STACEY POMRENKE and Wes Rosenbalm. The email to Company #1 solicited the funding of a luncheon for Bristol Virginia Utilities employees after the naming of Bristol Virginia Utilities as a finalist for an award. The email stated, in part:

> *Unfortunately, the local economy has made it impossible for us to sufficiently fund the celebration and recognize our employees appropriately. Therefore, we are asking our major long-term vendor partners to help with this celebration by making a cash contribution that will be used toward the cost of the event.*

12.     On or about July 2009, BVU Employee #1, at the direction of Wes Rosenbalm and STACEY POMRENKE, contacted Company #7 and solicited funding for a luncheon for Bristol Virginia Utilities employees after the naming of Bristol Virginia Utilities as a finalist for an award. As a result of this solicitation, Company #7 provided Bristol Virginia Utilities Board with a check mailed from California to the Western District of Virginia, payable to Bristol Virginia Utilities Board in the amount of $1,000.00.

13.     On or about June 16, 2010, STACEY POMRENKE sent an email to an employee of Company #9, located in Bristol, Tennessee stating in part:

> *Subject: RE: REDS TICKETS*
> *[Employee], can you get me four tickets for the July 31st game against the Atlanta Braves? I think my kids are of the age to enjoy it :)*

14.     On or about December 20, 2010, Employee #1 of Company #5 sent an email to STACEY POMRENKE stating, in part:

3

*Stacey:*
*I wanted to thank you for taking the time to do the call last week. I appreciate you helping to push [Utility Company #1] to make a decision. Hopefully, we can get something done sometime early next year.*

STACEY POMRENKE responded via email, stating, in part:

*Thank you [Employee #1]. Let's hope they can find a way out before November!!! Merry Christmas....so what was [Company #5]'s Christmas gifts this year to its customers.........??*

Employee #1 responded via email, stating, in part:

*It is a surprise, you should get it in the next day or so!*

15.     On or about August 22, 2011, STACEY POMRENKE requested suite tickets for the NASCAR Sprint Cup race on or about August 27, 2011, at the Bristol Motor Speedway from Company #6. When told by an employee of Company #6 that tickets might not be available, STACEY POMRENKE replied, via email, on or about August 22, 2011 at 1:49pm:

*How can one of your best customers not get suite tickets for the Saturday race?*

16.     On or about September 6, 2011, while in preliminary contract negotiations with Company #5, in anticipation of a Request for Proposals for services being issued by BVU, STACEY POMRENKE, via email from Bristol, Virginia to Atlanta, Georgia, contacted an employee of Company #5 and requested that Company #5 provide tickets to a University of Kentucky basketball or football game for Wes Rosenbalm and his five children.

17.     On or about November 16, 2011, Employee #1 of Company #5 notified STACEY POMRENKE that he had acquired five tickets to a University of Kentucky basketball game for Wes Rosenbalm and whether or not he should send the tickets to STACEY POMRENKE. STACEY POMRENKE replied via email from Bristol, Virginia sent to Atlanta, Georgia:

*Yes, but let's wait until we award the RFP – I do not want it construed as a gift during our process. Make sense?*

4

The employee of Company #5 responded to STACEY POMRENKE's email, by stating, in part:

> *It does.*

18.     On or about November 2011, Employee #3 of BVU, at the direction of STACEY POMRENKE and Wes Rosenbalm and others, solicited Company #3 to sponsor alcohol purchases for a customer appreciation event hosted by BVU.  On or about November 10, 2011, Wes Rosenbalm emailed STACEY POMRENKE and others and stated, in part:

> *We have a sponsor for the bar at the customer appreciation function.  Please have them send that bill to [Company #3], not BVU.*

19.     On or about December 22, 2011, and during contract negotiations with Company #5, STACEY POMRENKE received a bottle of bourbon from Employee #1 of Company #5. STACEY POMRENKE emailed the employee in Atlanta, Georgia, stating, in part:

> *Merry Christmas!!!   For the record – can we do something other than bourbon next year:)*

Employee #1 of Company #5 responded to STACEY POMRENKE's email, by stating, in part:

> *For sure, thanks a ton and Merry Christmas to you, are they overnighting the hard copies?*

20.     On or about and between January 1, 2008 and December 2013, STACEY POMRENKE received gift cards and gift certificates to be used at stores, spas, and restaurants from Company #3 as Christmas gifts.  On or about December 2008, Company #3 provided STACEY POMRENKE with a $200.00 gift certificate to the Martha Washington Inn for spa services.  On or about December 2009, Company #3 provided STACEY POMRENKE with gift cards to local restaurants.  On or about and between December 2009 and December 2010, STACEY POMRENKE requested that BVU Employee #3 contact Company #3 and tell

5

Company #3 that she preferred that Company #3 provide her with a Christmas gift of spa services at the Martha Washington Inn as opposed to a gift card to restaurants or stores. On or about December 2010, Company #3 provided STACEY POMRENKE a $250.00 gift certificate to the Martha Washington Inn. On or about December 2012, Company #3 provided STACEY POMRENKE with a $200.00 gift certificate to the Martha Washington Inn for spa services. On or about December 2013, Company #3 provided STACEY POMRENKE with a $100.00 gift card to Belk.

21.     On or about April 4, 2012, STACEY POMRENKE sent an email to an employee of Company #9, located in Bristol, Tennessee, stating, in part:

> *[Employee], we would like to see if you could get us tickets for a Cincinnati game for May 22nd at 7:10 against the Atlanta Braves.  It would be me, [non-BVU employee] and the kids.*
> *Thank you,*
> *Stacey*

22.     On or about August 17, 2012, STACEY POMRENKE sent an email from Bristol, Virginia to Atlanta, Georgia, to Employee #1 of Company #5, stating in part:

> *Hi [Employee #1], Did you get my email regarding me coming to Keeneland on 10-6?*

23.     On or about September 12, 2012, STACEY POMRENKE sent an email from Bristol, Virginia to Atlanta, Georgia, to Employee #1 of Company #5, stating in part:

> *Subject: Re: 2012 BVU Revenue Analysis_081512.xls*
> *Hi [Employee #1] – opening weekend at Keeneland is in a couple of weekends :)*
> *You had always said if I wanted to go to the race that [Company #5] had a suite, etc....*
> *Have you been able to line anything up?*

24.     On or about September 17, 2012, STACEY POMRENKE sent an email from Bristol, Virginia to Atlanta, Georgia, to Employee #1 of Company #5, stating in part:

> *Subject: RE: BVU Monthly Report*

6

> *[Employee #1], have you been getting my emails about Keenland?  I hate to be a pest....*

Employee #1 replied, in part:

> *I think [employee] got ya'll some tickets.  We don't have a suite there.*

On or about September 17, 2012, STACEY POMERENKE replied, via email, stating, in part:

> *I thought you told me you had a suite there??*

Employee #1 replied, in part:

> *No mam, sorry, we don't have one, they are very limited.  We just get tickets.*

On or about September 20, 2012, STACEY POMRENKE replied via email, stating, in part:

> *Got it :) thank you!*
> *BTW – did you tell me you could get Charlotte Panthers football tickets?*

Employee #1 replied, via email, stating, in part:

> *Stacey:*
> *For you , we can get them, just let me know.*

On or about September 21, 2012, STACEY POMERENKE replied, via email, stating in part:

> *Did you get the game that I need – can you do that? :) THANKS!!*

On or about September 24, 2012, Employee #3 of Company #5 sent an email to STACEY POMRENKE and Employee #1, stating in part:

> *The only tickets available for this game are upper corner of the end zone.  Not very good tickets at all.  There are some decent seats available for the Denver game.  What would you like to do?*

STACEY POMRENKE replied via email, stating, in part:

> *Hello[Employee #3], we will take them :) THANKS!!*

7

25.     On or about October 4, 2012, STACEY POMRENKE sent an email to Employee

#2 of Company #5, stating, in part:

> Subject: Keenland
> Hi [Employee #2], was checking to see if you were able to get four tickets for
> some of us BVU employees for Saturday?  You had gotten two tickets for me back
> in July/August and those were for the Healing Hands benefit where BVU/BTES
> sponsored the event.  The four tickets I am asking for would be for me and a
> couple of others to go to the race :)
> Thank you,
> Stacey

26.     On or about November 6, 2012, STACEY POMRENKE sent an email to

employees of BVU that stated, in part:

> Here is what I would like to have:
> Thanksgiving lunch underwritten by [Company #2] - $2,850
> Christmas Dinner underwritten by [Company #3] - $15,000
> Children's Christmas Party to be underwritten by [Company #4] - $5,500
> [Employee #1], can you reach out to [Company #2] and [Company #4]?
> [Employee #2]/[Employee #3] to contact Company #2.
> Thanks!
> Stacey

27.     At STACEY POMRENKE, Wes Rosenbalm, and other co-conspirators' direction,

BVU Employee #3 contacted Company #3 and requested they provide $15,000.00 to pay for the

BVU Christmas Dinner.  BVU Employee #3 told representatives of Company #3 that they had

been chosen to pay for this event due to the large amounts of money paid to Company #3 by

BVU.  Company #3 agreed to pay for the BVU Christmas Dinner.

28.     Company #2 provided BVU with $2,850.00 to pay for the BVU Thanksgiving

luncheon.

29.     On or about November 7, 2012, BVU Employee #1 sent an email from Bristol,

Virginia to Company #1, located in Charlotte, North Carolina, which stated, in part:

> We generally ask our long-established vendor partners for help this time of year
> in subsidizing various employee Thanksgiving and Christmas events.  I would like

8

> *to ask your consideration this year in subsidizing our Children's Christmas party*
> *@ $5,800. This will help provide food and gifts to employee children up to 12*
> *years old, and provide an opportunity for [Company #1] to gain good will and*
> *press within and without the BVU organization.*

30.  On or about November 7, 2012, BVU Employee #1 sent an email to Company #4, which stated, in part:

> *We generally ask our long-established vendor partners for help this time of year*
> *in subsidizing various employee Thanksgiving and Christmas events. I would like*
> *to ask your consideration this year in subsidizing our Children's Christmas party*
> *@ $5,800. This will help provide food and gifts to employee children up to 12*
> *years old, and provide an opportunity for [Company #4] to gain good will and*
> *press within and without the BVU organization.*

31.  On or about November 7, 2012, BVU Employee #1 sent an email to STACEY POMRENKE, Wes Rosenbalm, and others, which, in part stated:

> *I talked with [employee] @ [Company #4] and he agreed to run the request for*
> *$5,800 up the pole, but says [Company #4] is in a freeze on cash expenditures do*
> *(sic) to poor financials.*

32.  On or about November 14, 2012, STACEY POMRENKE sent an email to Wes Rosenbalm stating that Company #4 would pay for the BVU Children's Christmas party. An invoice was sent to Company #4 requesting payment in the amount of $5,800.00. Company #4 paid BVU $5,800.00. Both STACEY POMRENKE and Wes Rosenbalm had children who received gifts from the $5,800.00 paid by Company #4.

33.  On or about January 3, 2013, STACEY POMRENKE directed BVU Employee #3 to contact Company #3 and ask them to pay an invoice from the Foundation Event Facility in the amount of $12,297.18, which reflected the cost to BVU for its 2012 Employee Christmas Party held on December 15, 2012. STACEY POMRENKE further directed that Company #3 should pay the Foundation Event Facility directly.

9

34.     On or about and between March 10, 2003, and April 1, 2013, BVU paid bonuses to employees outside of the established payroll system.  These bonuses were paid in the form of cash and gift cards.

35.     On or about April 3, 2007, BVU Employee #10 sent an email to STACEY POMRENKE and Wes Rosenbalm detailing her plans to provide monetary incentives to BVU employees for selling BVU services.  Employee #10 stated, in part,

> *Also, because we're not dealing with large amounts of money, I think they would all rather have Wal-Mart gift cards rather than have their $100 taxed.*

36.     On or about July 13, 2007, STACEY POMRENKE sent an email to a Bristol Virginia Utilities Board employee stating, in part:

> *[C]an you spare $500 out of petty cash for me this a.m.  It is to pay a bonus to an employee.*

37.     On or about May 9, 2009, STACEY POMRENKE sent an email to a Bristol Virginia Board employee, stating:

> *[Employee #4], can you please provide me $500 from your petty cash balance. [Employee #5] this will be paid to a BVU employee as a bonus for Optinet (set top box recovery).  For each $26k in set top boxes recovered $500 bonus is paid.*

38.     On or about September 24, 2009, STACEY POMRENKE sent an email to accounting staff at Bristol Virginia Utilities Board stating, in part:

> *[W]e are going to buy $2k in gift cards for use for the remainder of the fiscal year for employee incentives/employee gifts, etc.*

39.     On or about December 8, 2010, STACEY POMRENKE sent an email to the controller of Bristol Virginia Utilities Authority and stated, in part:

> *I really would like to give VISA gift cards to everyone for their bonus – do you feel strongly we need to run it through payroll?  It will be a total of $5k.*

The controller responded via email:

10

*Visa cards are easier, but they are still taxable income.  If we run it through payroll, that removes any potential liability on this.*

In a later email, the controller stated:

*[T]he IRS views gift cards the same as cash.  Any cash payment is considered taxable.*

In a later email, STACEY POMRENKE stated:

*I would still rather do gift cards :(*

In response, the controller replied via email:

*I would to, (sic) but technically running it through payroll is the right thing to do.*

40.     On or about January 25, 2011, STACEY POMRENKE sent an email to an employee at Bristol Virginia Utilities Authority stating, in part:

> *[Employee #4], will you please bring me a total of $500 from petty cash to pay out this $25k recovery milestone.  I will need the $500 packaged the following way:*
> >     *[Employee #6] $80*
> >     *[Employee #7] $65*
> >     *[Employee #8] $355*

41.     On or about September 2, 2011, STACEY POMRENKE sent an email that stated, in part:

> *I am hoping to get to the mall today to purchase $2500 in gift cards for BVU to use for employee incentive plans, etc.*

42.     On or about September 6, 2011, STACEY POMRENKE sent an email to a Bristol Virginia Utilities Authority employee that stated, in part:

> *$500 – can you see if we have $500 in petty cash to pay [Employee #7] his bonus for the recovery of $25 in set top boxes.  THANKS!*

43.     On or about September 18, 2012, BVU Employee #8 sent an email to STACEY POMRENKE that stated, in part:

> *Stacey*

> *[Employee #7] has reached the 25000 plateau for the 500 bonus.  If you could get it for him it would be appreciated.*

In response, STACEY POMRENKE then sent an email to BVU Employee #4 that stated, in part:

> *Can you get $500 for me from petty cash?*

44.    On or about and between March 10, 2003, and April 1, 2013, BVU knowingly and intentionally did not report these bonuses to the Internal Revenue Service on Internal Revenue Service forms W-2 or 1099.

45.    On or about and between January 1, 2009, and April 1, 2013, BVU paid bonuses to employees in an amount of at least $48,000.00.  These bonuses were not reported to the Internal Revenue Service.  Payroll withholdings were not made from these bonuses.  W-2 forms submitted to the Internal Revenue Service and Social Security Administration fraudulently underreported the compensation received by BVU employees.

46.    On or about and between March 10, 2003, and April 1, 2013, STACEY POMRENKE, as Chief Financial Officer, knew that Internal Revenue Service W-2 forms filed with the Internal Revenue Service and the Social Security Administration and certified, at her direction, by employees of BVU, as accurate, in fact, did not contain accurate information and contained fraudulent and false information.  STACEY POMRENKE knew these forms did not accurately reflect the compensation and benefits provided by BVU to its employees.

47.    On or about June 2006, BVU purchased a vehicle from STACEY POMRENKE and her husband to be put into official use and paid $31,000.00 to a bank in order to pay off an auto loan to benefit STACEY POMRENKE and her husband.

48.    On or about and between July 2006 and August 2012, STACEY POMRENKE and at least five other employees of BVU received the use of government owned vehicles for non-business related personal use.  On or about and between July 2006 and January 1, 2012,

12

STACEY POMRENKE, as Chief Financial Officer for BVU, did not report this taxable benefit to the Internal Revenue Service and provided false information regarding the compensation and benefits provided to those employees of BVU when filing form W-2 with the Internal Revenue Service and the Social Security Administration.  The value of this taxable benefit was at least $500.00 month per employee for a total of $6,000.00 per employee per year.

49.     On or about and between December 2007 and April 2015, BVU paid for memberships at the Bristol Country Club for STACEY POMRENKE, Wes Rosenbalm, and two other employees.  In total, more than $69,748.00 was paid on behalf of these individuals to the Bristol Country Club for membership.  This taxable benefit was not reported to the Internal Revenue Service or the Social Security Administration and, accordingly, forms W-2 submitted to the Internal Revenue Service and the Social Security Administration for these four individuals contained false and fraudulent information regarding the compensation provided by BVU.

## COUNT ONE

The Grand Jury charges that:

1.     The Introduction is realleged and incorporated by reference.

2.     On or about and between January 1, 2003, and January 1, 2014, in the Western District of Virginia and elsewhere, STACEY POMRENKE and others, known and unknown to the grand jury conspired to (a) defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of taxes; (b) in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully make a materially false statement and representation and make or use any false writing or document knowing the same to contain any materially false, fictitious, or

USAO#2015R00576

fraudulent statement or entry, in violation of 18 U.S.C. §§ 1001(a)(1) and 10001(a)(2); and (c) corruptly solicit or demand for the benefit of any person, or accept or agree to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more, while being an agent and officer of a state or local government agency that receives $10,000 or more in federal funding from a Federal program involving a grant, contract or other form of Federal assistance, in any one year period, in violation of 18 U.S.C. § 666(a)(1)(B).

3.      To effect the objects of the conspiracy, the defendant and her co-conspirators, did acts in the Western District of Virginia and elsewhere, including, but not limited to acts listed in the Introduction to this indictment.

4.      All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**

The Grand Jury charges that:

1.      The Introduction is realleged and incorporated by reference.

2.      On or about January 27, 2011, in the Western District of Virginia and elsewhere, STACEY POMRENKE, as a principal and as an aider and abettor, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully caused the making of a materially false statement and representation and caused to be made or used any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

3.      On or about January 27, 2011, an employee of BVU, at the direction of STACEY POMRENKE electronically filed Internal Revenue Service forms W-2 for BVU and its

14

employees for the 2010 tax year with the Social Security Administration.  As Chief Financial

Officer for BVU, STACEY POMRENKE was responsible for ensuring that accurate information

related to Social Security and Medicare Wages and benefits of BVU employees was transmitted

to the Social Security Administration via forms W-2.

4.      Specifically, STACEY POMRENKE knew that BVU's forms W-2 did not

accurately reflect the compensation and benefits provided to employees at BVU.  In fact,

STACEY POMRENKE knew that the forms W-2 underreported compensation and benefits

provided to employees of BVU as the forms W-2 did not report compensation and benefits in the

form of gift cards, cash bonuses, BVU vehicle usage, and country club memberships provided to

employees of BVU.

5.      The Social Security Administration is part of the executive branch of the United

States Government.

6.      All in violation of Title 18, United States Code, Sections 2, 1001(a)(1), and

1001(a)(2).

## COUNT THREE

The Grand Jury charges that:

1.      The Introduction is realleged and incorporated by reference.

2.      On or about January 18, 2012, in the Western District of Virginia and elsewhere,

STACEY POMRENKE, as a principal and as an aider and abettor, in a matter within the

jurisdiction of the executive branch of the Government of the United States, knowingly and

willfully caused the making of a materially false statement and representation and caused to be

made or used any false writing or document knowing the same to contain any materially false,

fictitious, or fraudulent statement or entry.

USAO#2015R00576

3.      On or about January 18, 2012, an employee of BVU, at the direction of STACEY POMRENKE electronically filed Internal Revenue Service forms W-2 for BVU and its employees for the 2011 tax year with the Social Security Administration.  As Chief Financial Officer for BVU, STACEY POMRENKE was responsible for ensuring that accurate information related to wages and benefits of BVU employees was transmitted to the Social Security Administration via forms W-2.

4.      Specifically, STACEY POMRENKE knew that BVU's forms W-2 did not accurately reflect the compensation and benefits provided to employees at BVU.  In fact, STACEY POMRENKE knew that the forms W-2 underreported compensation and benefits provided to employees of BVU as the forms W-2 did not report compensation and benefits in the form of gift cards, cash bonuses, BVU vehicle usage, and country club memberships provided to employees of BVU.

5.      The Social Security Administration is part of the executive branch of the United States Government.

7.      All in violation of Title 18, 1001 United States Code, Sections 2, 1001(a)(1), and 1001(a)(2).

## COUNT FOUR

The Grand Jury charges that:

1.      The Introduction is realleged and incorporated by reference.

2.      On or about January 28, 2013, in the Western District of Virginia and elsewhere, STACEY POMRENKE, as a principal and as an aider and abettor, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully caused the making of a materially false statement and representation and caused to be

made or used any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

3.      On or about January 28, 2013, an employee of BVU, at the direction of STACEY POMRENKE electronically filed Internal Revenue Service forms W-2 for BVU and its employees for the 2012 tax year with the Social Security Administration.  As Chief Financial Officer for BVU, STACEY POMRENKE was responsible for ensuring that accurate information related to wages and benefits of BVU employees was transmitted to the Social Security Administration via forms W-2.

4.      Specifically, STACEY POMRENKE knew that BVU's forms W-2 did not accurately reflect the compensation and benefits provided to employees at BVU.  In fact, STACEY POMRENKE knew that the forms W-2 underreported compensation and benefits provided to employees of BVU as the forms W-2 did not report compensation and benefits in the form of gift cards, cash bonuses, BVU vehicle usage, and country club memberships provided to employees of BVU.

5.      The Social Security Administration is part of the executive branch of the United States Government.

6.      All in violation of Title 18, 1001 United States Code, Sections 2, 1001(a)(1), and 1001(a)(2).

## COUNT FIVE

The Grand Jury charges that:

1.      The Introduction is realleged and incorporated by reference.

2.      On or about and between January 1, 2008 and January 31, 2013, in the Western District of Virginia and elsewhere, STACEY POMRENKE and others, conspired to obstruct,

17

delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, section 1951, namely, conspired to obtain the property of multiple victims, with the victims' consent, induced by the wrongful use of fear of economic loss and under color of official right.

3.     All in violation of Title 18, United States Code, Section 1951.

### COUNT SIX

The Grand Jury charges that:

1.     The Introduction is realleged and incorporated by reference.

2.     On or about November 2011, in the Western District of Virginia and elsewhere, STACEY POMRENKE, as a principal and as an aider and abettor, affected commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, section 1951, namely, by causing property to be obtained from Company #3, with Company #3's consent, induced by the wrongful use of fear of economic loss and under color of official right.

3.     All in violation of Title 18, United States Code, Sections 2 and 1951.

### COUNT SEVEN

The Grand Jury charges that:

1.     The Introduction is realleged and incorporated by reference.

2.     On or about and between November 2012 and January 2013, in the Western District of Virginia and elsewhere, STACEY POMRENKE, as a principal and as an aider and abettor, affected commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951, namely, by

causing property to be obtained from Company #3, with Company #3's consent, induced by the wrongful use of fear of economic loss and under color of official right.

    3.      All in violation of Title 18, United States Code, Sections 2 and 1951.

## COUNT EIGHT

The Grand Jury charges that:

    1.      The Introduction is realleged and incorporated by reference.

    2.      On or about and between November 2012 and January 2013, in the Western District of Virginia and elsewhere, STACEY POMRENKE, as a principal and as an aider and abettor, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more, while being an agent and officer of a state or local government agency that receives $10,000 or more in federal funding from a Federal program involving a grant, contract or other form of Federal assistance, in any one year period.

    3.      All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT NINE

The Grand Jury charges that:

    1.      The Introduction is realleged and incorporated by reference.

    2.      On or about and between January 2008 and January 2013, in the Western District of Virginia and elsewhere, STACEY POMRENKE and others, conspired to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to deprive the customers of BVU, and others, of the intangible right of honest services, namely, to refrain from accepting

bribes and kickbacks, and in doing so to transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. §§ 1343 and 1346.

3.    All in violation of Title 18, United States Code, Section 1349.

## COUNTS TEN through FIFTEEN

The Grand Jury charges that:

1.    The Introduction is realleged and incorporated by reference.

2.    On or about and between January 2008 and January 2013, in the Western District of Virginia and elsewhere, STACEY POMRENKE, as a principal and as an aider and abettor, did knowingly and with the intent to defraud, devise and intend to devise and participate in a scheme and artifice to deprive the citizens the customers of BVU, and others, of the intangible right of honest services in BVU matters, namely, to refrain from accepting bribes and kickbacks.

3.    The purpose of this scheme and artifice to defraud was for vendors of BVU to offer, promise, and give things of value to STACEY POMRENKE and others, with the intent for POMRENKE to use and misuse her position as Chief Financial Officer of BVU to manipulate and influence BVU's awarding of lucrative contracts.

4.    On or about the dates specified as to each count below, in the Western District of Virginia, and elsewhere, for the purpose of executing and attempting to execute this scheme and artifice to defraud, STACEY POMRENKE did knowingly transmit and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds:

**COUNT      DATE       ITEM OF VALUE**

USAO#2015R00576

| TEN | 12/13/2010 | $250 Spa Services Gift Card |
| ELEVEN | 8/22/2011 | NASCAR Tickets |
| TWELVE | 11/16/2011 | UK basketball tickets |
| THIRTEEN | 11/23/2012 | Charlotte Panthers Tickets |
| FOURTEEN | 12/10/2012 | $200 Spa Services Gift Card |
| FIFTEEN | 4/4/2012 | Cincinnati Reds Tickets |

5.　　All in violation of Title 18, United States Code, Sections 2, 1343, and 1346.

## NOTICE OF FORFEITURE

1.　　The allegations contained in the Counts of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.　　Upon conviction of the offenses set forth in the Indictment, the defendant, STACEY POMERENKE, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), $50,000 in United States currency, in that such sum in aggregate was obtained directly or indirectly as a result of said offenses or is traceable to such property.

3.　　If any of the property described above, as a result of any act or omission of the defendant:

　　　　a.　　cannot be located upon the exercise of due diligence;
　　　　b.　　has been transferred or sold to, or deposited with, a third party;
　　　　c.　　has been placed beyond the jurisdiction of the court;
　　　　d.　　has been substantially diminished in value; or
　　　　e.　　has been commingled with other property which cannot be divided without difficulty,

USAO#2015R00576

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

    4.      All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL, this _26th_ day of _Oct_____, 2015.

/s/Grand Jury Foreperson

ANTHONY P. GIORNO
United States Attorney

USAO# 2015R00576