# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 1:15CR00033 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| STACEY POMRENKE, | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Zachary T. Lee, Assistant United States Attorney and Kevin L. Jayne, Special Assistant United States Attorney, Abingdon, Virginia, for United States; R. Wayne Austin and David L. Scyphers, Scyphers & Austin, P.C., Abingdon, Virginia, and Joel B. Miller, Joel B. Miller, PLC, Roanoke, Virginia, for Defendant.*

A jury has convicted the defendant, a top official of a public utility, of corruption and tax fraud charges. She has moved for acquittal notwithstanding the jury's verdict and alternatively for a new trial before a different jury. For the reasons hereafter explained, I will deny her motions.

In summary, I hold that the government presented sufficient evidence at trial to support the charges of which she was convicted by the jury. The Supreme Court's recent decision in *McDonnell v. United States* does not affect the validity of these convictions. As to the request for a new trial, I find that the defendant's motions seeking a new trial were filed late and without adequate excuse for being filed out of time. In any event, even considering the grounds asserted for a new

trial, they are without merit. I believe that the defendant received a fair trial by a jury of her peers and I will not set aside its verdict.

## I.

## Background.

Defendant Stacey Pomrenke was the Chief Financial Officer ("CFO") and Executive Vice President of Bristol Virginia Utilities Authority ("BVU"), formerly known as Bristol Virginia Utilities Board. BVU is a political subdivision of the Commonwealth of Virginia. Va. Code Ann. § 15.2-7201. BVU provides water, sewer, and electric power services, as well as internet, cable television, and telephone services, to residential and commercial customers in the City of Bristol, Virginia, and in other localities. BVU employs approximately 260 to 280 full-time and part-time employees and generates more than $100,000,000 in annual gross revenues. Beginning in November of 2013, the FBI and the IRS began an investigation of allegations of misconduct at BVU. As a result of this investigation, nine persons to date connected with BVU have been convicted of public corruption or related charges, including the President and Chief Executive Officer, two vice-presidents, the General Counsel, and two former chairs of the Board of Directors. All except Pomrenke pleaded guilty.

2

Pomrenke was indicted on October 26, 2015. After an eight-day trial that began on February 16, 2016, the jury returned its verdict convicting her of all but one of the charges.[1] Those charges were as follows:

Count One:  Conspiracy to (a) commit tax fraud, (b) make a materially false statement in a matter within the jurisdiction of the executive branch of the federal government, and (c) solicit or accept items of value intending to be influenced or rewarded in connection with a transaction involving $5,000 or more while being an officer of a local governmental agency that receives at least $10,000 in federal funds in a  one year period, all in violation of 18 U.S.C. §§ 371, 666(a)(1)(B), and 1001(a)(1)-(2).

Count Two:  Making materially false statements to the Social Security Administration by directing the filing of W-2 forms for the 2010 tax year that she knew did not accurately reflect all compensation and benefits provided to BVU employees, in violation of 18 U.S.C. §§ 2 and 1001(a)(1)-(2).

Count Three:  Making materially false statements to the Social Security Administration by directing the filing of W-2 forms for the 2011 tax year that she

---

[1]   The jury acquitted the defendant of Count Six, which charged her with affecting commerce by extortion by obtaining the property of ETI through the wrongful use of fear of economic loss and under color of official right, in violation of 18 U.S.C. §§ 2 and 1951.   This was the same crime charged in Count Seven, but involved different factual allegations.

3

knew did not accurately reflect all compensation and benefits provided to BVU employees, in violation of 18 U.S.C. §§ 2 and 1001(a)(1)-(2).

Count Four:  Making materially false statements to the Social Security Administration by directing the filing of W-2 forms for the 2012 tax year that she knew did not accurately reflect all compensation and benefits provided to BVU employees, in violation of 18 U.S.C. §§ 2 and 1001(a)(1)-(2).

Count Five:  Conspiracy to affect commerce by extortion by obtaining the property of victims through the wrongful use of fear of economic loss and under color of official right, in violation of 18 U.S.C. § 1951.

Count Seven:  Between November 2012 and January 2013, affecting commerce by extortion  by obtaining property from ETI by the wrongful use of fear of economic loss and under color of official right, in violation of 18 U.S.C. §§ 2 and 1951.

Count Eight:  Between November 2012 and January 2013, committing program bribery, in violation of 18 U.S.C. §§ 2 and 666(a)(1)(B).

Count Nine:  Conspiracy to commit honest services wire fraud by accepting bribes and kickbacks, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.

Count Ten:  Devising and participating in a scheme to deprive BVU customers and others of the right of honest services by accepting a $250 spa services gift card on December 13, 2010, in exchange for Pomrenke's influence

4

over BVU's awarding of a contract, and using wire communications in interstate commerce to execute the scheme, in violation of 18 U.S.C. §§ 2, 1343, and 1346.

Count Eleven: Devising and participating in a scheme to deprive BVU customers and others of the right of honest services by accepting NASCAR tickets on August 22, 2011, in exchange for Pomrenke's influence over BVU's awarding of a contract, and using wire communications in interstate commerce to execute the scheme, in violation of 18 U.S.C. §§ 2, 1343, and 1346.

Count Twelve: Devising and participating in a scheme to deprive BVU customers and others of the right of honest services by accepting University of Kentucky basketball tickets on November 16, 2011, in exchange for Pomrenke's influence over BVU's awarding of a contract, and using wire communications in interstate commerce to execute the scheme, in violation of 18 U.S.C. §§ 2, 1343, and 1346.

Count Thirteen: Devising and participating in a scheme to deprive BVU customers and others of the right of honest services by accepting Carolina Panthers tickets on November 23, 2012, in exchange for Pomrenke's influence over BVU's awarding of a contract, and using wire communications in interstate commerce to execute the scheme, in violation of 18 U.S.C. §§ 2, 1343, and 1346.

Count Fourteen: Devising and participating in a scheme to deprive BVU customers and others of the right of honest services by accepting a $200 spa

5

services gift card on December 10, 2012, in exchange for Pomrenke's influence over BVU's awarding of a contract, and using wire communications in interstate commerce to execute the scheme, in violation of 18 U.S.C. §§ 2, 1343, and 1346.

Count Fifteen: Devising and participating in a scheme to deprive BVU customers and others of the right of honest services by accepting Cincinnati Reds tickets on April 4, 2012, in exchange for Pomrenke's influence over BVU's awarding of a contract, and using wire communications in interstate commerce to execute the scheme, in violation of 18 U.S.C. §§ 2, 1343, and 1346.

Following the verdict of the jury on February 26, 2016, the defendant filed a motion on March 2, 2016, entitled, "Motion for Extension of Time to Renew Rule 29 Motion for Judgment of Acquittal." (ECF No. 149.) In that motion, the defendant noted that the Federal Rules of Criminal Procedure required a motion for judgment of acquittal to be filed within 14 days after verdict. *See* Fed. R. Crim. P. 29(c)(1). Counsel represented that they were in the process of drafting such a motion and needed additional time to have the trial transcript prepared. The motion requested an extension of time to April 29, 2016. The motion was granted by the court the same day, expressly extending the time to file a renewed motion for judgment of acquittal to April 29. (Min. Order, Mar. 3, 2016, ECF No. 150.)

On April 15, 2016, the defendant filed a motion entitled, "Second Motion for Extension of Time to Renew Rule 29 Motion for Judgment of Acquittal." (ECF

6

No. 168.)  That motion requested the court to extend the deadline for filing a Rule 29 motion for judgment of acquittal to May 20, 2016.  The motion was granted in part by the court, extending the time to file a renewed motion for judgment of acquittal to May 10, 2016.  (Order, Apr. 19, 2016, ECF No. 180.)

On the deadline, May 10, an attorney for the defendant file a motion entitled "Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure."  (ECF No. 188.)  That motion stated that it was directed at Counts Five and Seven through Fifteen, and that a different defense attorney would address Counts One through Four by separate motion.[2]  The motion was supported by a brief in which it was argued that the defendant was entitled to acquittal on the charges relating to program fraud, honest services fraud, and extortion, because the government had failed to prove the necessary criminal intent.

On the same day, counsel filed a Motion for a New Trial, asserting errors by the court in jury selection, instructions, and exclusion of certain evidence proffered by the defendant.  (ECF No. 190.)  The defendant requested the court to grant a new trial on these grounds.

On May 11, separate defense counsel filed a motion entitled, "Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal

---

[2]    The defendant was represented by three attorneys at trial.  One of them, Mr. Miller, primarily handled the defense of the tax charges and he has filed the separate post-trial motions related to those issues.

7

Procedure—Tax Counts." (ECF No. 192.) The motion and its accompanying brief sought acquittal as to Counts One through Four on the grounds that the government had failed to prove criminal intent. In addition, the motion asserted that the court had erred in admitting two of the government's exhibits relating to the tax charges.

Also on May 11, separate counsel filed a motion entitled, "Motion for New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure—Tax Counts." (ECF No. 193.) In that motion, the defendant sought a new trial on the grounds that the court had erred in admitting the same government exhibits as referenced in the May 11 motion for acquittal, as well in excluding certain testimony by the defendant's tax expert, John Merrell.

The court directed the government to respond to these motions, and in its order, pointed out that the motions seeking a new trial appeared to be untimely since Federal Rule of Criminal Procedure 33(b)(2) requires such a motion to be filed within 14 days of the verdict. (Order, May 11, 2016, ECF No. 194.) The defendant then filed a motion seeking extensions of time to file the two motions for a new trial. (Mot., May 12, 2016, ECF No. 195.) A separate motion for extension of time was filed as to the motion seeking judgment of acquittal as to the tax counts filed on May 11, the day after the deadline, on the ground that computer problems prevented the electronic filing of the motion until shortly after midnight on May 10. (Mot., May 12, 2016, ECF No. 196.)

8

The government has responded to the motions and the defendant has filed a reply. In addition, at the request of the court, the parties have filed memoranda as to the affect, if any, of the Supreme Court's decision on June 27, 2016, in the case of *McDonnell v. United States*. The motions are thus ripe for decision. I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

## II.

### Trial Evidence.

The following summarizes the evidence presented at trial.

Michael Bundy, a former Chief Operating Officer ("COO") and former interim President and Chief Executive Officer ("CEO") of BVU, began working for BVU in 2012. As COO, Bundy was one of the top three executives, along with Pomrenke and CEO Wes Rosenbalm. Both Pomrenke and Bundy reported directly to Rosenbalm, and Rosenbalm reported to the BVU Board of Directors. Bundy oversaw BVU's operational departments, and Pomrenke oversaw the finance, accounting, and marketing departments.

BVU was awarded a federal grant of $22,698,010 ("NTIA Grant") to expand fiber optic connectivity throughout Southwest Virginia. BVU received the funds and then used them to pay for internal expenses related to the project or to pay

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 9 of 140   Pageid#: 5589

contractors for work done on the project. The government funds paid for the cost of expanding BVU's fiber optic network for the delivery of internet, phone, and cable television services. These services are marketed by BVU under the trade name "OptiNet." Bundy had prepared and explained to the jury a spreadsheet showing the amounts of NTIA Grant money used by BVU from August 2010 through October 2013, which accounted for the full amount of the grant.

Bundy testified that BVU employees had been given cash longevity bonuses as well as $25 pre-paid debit cards as birthday gifts. Some employees in sales roles also received sales commissions in the form of pre-paid debit cards, and some employees received bonuses upon for recovering BVU equipment from former customers.[3] Bundy received $25 pre-paid debit cards for his birthday, and he was not taxed on those amounts.

Around October 2013, Bundy talked to Pomrenke about giving employees payments in the form of cash or pre-paid debit cards. In December 2011, before he began working for BVU, Bundy was invited to the BVU Christmas party and witnessed employees being given cash bonuses. He said to Pomrenke, "Stacey, we can't be doing this, paying people in cash without running it through payroll."

---

[3]    The equipment in question was the so-called "set top box" used by BVU customers in connection with BVU's cable TV service. Often when customers terminated that service, they would not return the valuable set top box to BVU, requiring a BVU employee to travel to the customer's home and retrieve it.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 10 of 140   Pageid#: 5590

(Trial Tr. 15, Feb. 17, 2016, ECF No. 157.)  Pomrenke responded, "This is what we do at BVU, and this is how Wes wants it done."  (*Id.*)

Bundy was provided a company vehicle during his employment at BVU, beginning in February or March of 2012.  He was permitted to drive the vehicle for personal use, but if he took the vehicle outside of the BVU service area, he was required to pay for fuel.  When Bundy began working at BVU, Pomrenke also drove a BVU company vehicle.   Bundy only had a company vehicle for about six months.  His brother, who is the COO of a West Virginia political subdivision, explained to Bundy the rules regarding use of government vehicles, and Bundy then returned his vehicle to BVU.  Rosenbalm, Pomrenke, and Bundy reviewed vehicle usage throughout BVU and assessed who should have company vehicles and who should not.

Bundy testified that BVU paid for Country Club of Bristol ("Country Club") memberships for certain employees.  He believed that Rosenbalm, Pomrenke, and Walter Bressler, BVU's general counsel, had BVU-paid Country Club memberships.

On November 6, 2012, Pomrenke sent an email to Bundy and BVU employees Mark Lane, Adam Martin, Stacy Evans, and Brad Griswold.  The subject of the email was "Underwriting – Holiday employee events," and the email read:

11

Here is what I would like to have:

Thanksgiving lunch underwritten by ETI Software - $2,850
Christmas Dinner underwritten by ETI Construction - $15,000
Children's Christmas Party to be underwritten by Alcatel - $5,500

Mark Lane, can you reach out to ETI and Alcatel? Mike / Dave Copeland to contact ETI Construction.

Thanks!
Stacey

(Gov't. Ex. 77, ECF No. 106-5.) Lane was the Chief Technology Officer, Martin was the manager of the network operations center, Evans was the manager of the engineering department, and Griswold was the manager of the environmental, safety, and grounds departments and BVU's garage. ETI Software, ETI Construction, and Alcatel Lucent ("Alcatel") were all vendors to BVU. Prior to the requests discussed in the email, these vendors had not agreed to pay for employee parties as part of their business relationships with BVU. Despite Pomrenke's request, Bundy did not contact ETI Construction about underwriting the Christmas dinner because Vice President David Copeland had a stronger relationship with ETI Construction. Bundy attended the 2012 Christmas dinner, which was attended by BVU employees and their spouses and guests. The dinner included food, entertainment, and awards. He did not attend the children's Christmas party that year, but it was customary for employees who had children under the age of twelve to attend the party with their children.

Pomrenke entered into an employment agreement with BVU on August 19, 2010. In the employment agreement, Pomrenke agreed not to compete with BVU. The employment agreement had a rolling ten-year term as long as Pomrenke continued to receive positive annual evaluations. If in any year Pomrenke did not receive a positive evaluation from the President of BVU, the term would cease to renew and would instead convert to a ten-year fixed term. The ten-year rolling term would automatically be reinstated the following year, unless the President notified Pomrenke in writing each June that the contract term would not renew. Regarding her company vehicle, the employment agreement provided that BVU would pay all operating and maintenance expenses except for fuel used to operate the vehicle outside of the BVU service territory. After 150,000 miles or seven years, or earlier with BVU's approval, Pomrenke could trade in the vehicle for another one or instead elect to receive a monthly car allowance of $589.10, adjusted annually. Bundy testified that in his training and experience, ten years was a long term for an employment contract.

Pomrenke's employment agreement provided that if Pomrenke were terminated without cause, she would be entitled to severance benefits totaling her full compensation, including benefits and vehicle allowance, through the end of the contract term. However, if she were terminated for a major cause, she would not

receive any compensation beyond the last day preceding her termination. The employment agreement defined a "major cause" as:

(i) Gross neglect of her duties that she does not correct within 120 days after written warning;

(ii) Willful refusal to obey a lawful written directive of BVU;

(iii) Fraud or embezzlement;

(iv) Confession to or conviction of a felony.

(Gov't Ex. 2 § 9, ECF No. 106-6.)

Bundy testified that BVU eventually issued amended W-2 forms for its employees to account for their unreported income, but not until after law enforcement began its investigation of BVU. The amended W-2 forms were issued in April 2014, on the advice of a tax attorney. Bundy ultimately made the decision not to purchase and give any more pre-paid debit cards to employees. On October 17, 2014, when Bundy was Interim President and CEO, he sent an email to Pomrenke with the subject "Employee Incentive." The email stated, "When you pay out the employee incentive payment, the last week of October, make sure that it is taxed as normal payroll. I understand this is a slight change from previous years, but in my opinion, it is the cleanest methodology." (Gov't Ex. 145, ECF No. 106-7.) Bundy sent this email after the law enforcement investigation of BVU had begun. He believed that taxing incentive payments was in compliance with state and federal law.

14

BVU employee Brad Griswold testified that he had also received payments outside of the official payroll system. He received set top box recovery bonuses in the form of cash as well as two pre-paid debit cards in the amount of $25 as birthday gifts. For every $26,000 worth of set top boxes recovered, Griswold and his team received a $500 bonus, which was divided proportionally among the team based on the total value of the equipment each employee recovered. Pomrenke determined the bonus amount and how it would be paid. Griswold reported to Pomrenke, who oversaw all of the finances of BVU. When an employee reached the $26,000 equipment recovery milestone, Griswold would go to Pomrenke's office and pick up $500 cash in an envelope. Around 2007 to 2008, Griswold did this about four or five times. At least five other employees assisted Griswold with equipment recovery, and they also received cash bonuses. Equipment recovery was performed on Saturdays, outside of normal working hours, and was in excess of the employees' normal working duties. However, the employees performing equipment recovery were paid for their time in addition to any bonuses they received.

Griswold stopped participating in the equipment recovery bonus program in 2008 or 2009, when he began working on another project that made him unavailable to make equipment recovery visits. After that point, Griswold would tell Pomrenke by phone or email that the team had reached the $26,000 milestone,

and Pomrenke would usually obtain the bonus money and give it to another employee for distribution.

The government introduced petty cash receipts for some of the equipment recovery bonuses. The receipts were signed by Pomrenke. Griswold testified that he did not always see or sign the receipts. When Griswold received a cash bonus, he did not believe the amount was reported on his W-2 form for federal income tax purposes. Griswold did not personally report the cash bonuses on his income tax returns.

The government introduced an email from Pomrenke to Griswold, dated Sunday, December 14, 2008, in which Pomrenke described damage to her company vehicle. In the email, Pomrenke wrote that the damage had occurred the previous morning at about 10:20 a.m. while she was taking her daughter to a performance at the Barter Theatre in Abingdon, Virginia. Griswold worked as Pomrenke's subordinate for approximately eight years, and his office was located near hers. He is generally aware of the business purposes for which BVU vehicles are used, and those purposes typically would not include Pomrenke taking her daughter to the theatre. BVU was a sponsor of the Barter Theatre, and BVU employees did attend productions there with tickets obtained in exchange for the BVU sponsorship. If Pomrenke had been attending the play as a representative of BVU, that may have fallen within her job description.

Griswold also drove a BVU vehicle for a period of time.  The value of that company vehicle use was not reported on his W-2 form.

Griswold and other employees received an annual Christmas bonus that was calculated based on the employee's salary.  The Christmas bonuses were reported on IRS 1099 forms, and the amounts were direct deposited into the employees' checking accounts.

 Donna Biggs, Administrative Services Manager and Secretary of the Board of Directors, had worked at BVU since 2002.  She oversaw human resources and performed general administrative duties.  She performed administrative tasks for Pomrenke, including some personal tasks, and handled petty cash withdrawals.  On September 6, 2011, Pomrenke emailed Biggs and Amanda Mast to request $500 in cash to pay an equipment recovery bonus.  On September 18, 2012, Pomrenke emailed Leslie Heckford and copied Biggs to request $500 in cash for another bonus.  Heckford replied that she did not have that much cash in her possession.  Pomrenke responded, "I will get him a gift card this time… Thank you!"  (Gov't Ex. 37, ECF No. 110-3.)  The gift cards BVU generally used for such purposes were pre-paid debit cards that could be used like a credit or debit card.  Biggs handed out similar gift cards in $25 increments for employees' birthdays.

On November 20, 2009, Pomrenke sent an email to Rosenbalm that stated:

> Wes, each year I have given $50 - $100 to my accounting staff after the completed audit.

I would like to do that again this year – I did budget for this.

It will be a total of 9 gift cards.

(Gov't Ex. 38, ECF No. 110-4.) Rosenbalm responded, "Up to you but it will send the wrong signal if it gets out because of the Christmas bonus." (*Id.*)

The government introduced a series of petty cash receipts documenting additional cash bonus amounts, including $500 retirement gifts for five employees and two equipment recovery bonuses of $500 each. Pomrenke signed most of these receipts, indicating that she had approved the requests. Biggs testified that a payroll change form would have been submitted to the accounting department indicating that each employee was receiving a $500 bonus. Similar cash bonuses had been paid by Pomrenke's predecessors before Pomrenke worked for BVU.

In her resume that was contained in her BVU personnel file, Pomrenke described herself as an "[a]ccomplished finance and accounting executive with fifteen years experience in the energy and utility industry." (Gov't Ex. 143, ECF No. 110-1.) Regarding her work at BVU, Pomrenke wrote that she:

> Serves as company's second in command, reporting to chief executive officer. Guides overall company policies and goals in addition to oversight of all accounting, finance, budgeting, regulatory and warehouse functions for the utilities four operating divisions, consisting of electric, water, waste water and fiber optic service operations. Also directs all day-to-day accounting, finance, functions and regulatory relations, including reporting, monitoring and communicating with the VSCC and the Federal Communications Commission.

(*Id.*) She also:

18

> Managed all accounting, finance, budgeting, regulatory and warehouse functions for the utilities four operating divisions consisting of electric water, waste water and fiber optic service operations with a staff of nine persons. Directed all day-to-day accounting and finance functions, to include daily cash receipts, customer billings, inventories, plant additions/disposals, cash management, payroll, revenue and tax reporting.

(*Id.*)

By email sent on January 26, 2011, Pomrenke asked Biggs to add Pomrenke's husband to Pomrenke's BVU-paid membership at the Country Club. Pomrenke's husband was not an employee of BVU, and while he had previously served as a BVU board member, he had no affiliation with BVU at the time. At the top of Pomrenke's Country Club membership agreement, the word "fitness" was written. Biggs was not aware of Pomrenke ever using the membership for business purposes. The addition of Pomrenke's husband would not necessarily have increased the cost of the membership.

Gail Childress, Director of Community Outreach for BVU, worked under Pomrenke for a number of years, though she did not report directly to Pomrenke. Childress was involved in planning parties for BVU beginning around 2002. At one point, Lane, the Chief Technology Officer, directed Childress to send an invoice to a BVU vendor for a party. Childress recalled that the amount of the invoice was $1,000.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 19 of 140   Pageid#: 5599

On October 14, 2010, Childress sent an email to Rosenbalm, copying Pomrenke and Kyle Hollifield, asking how much she could spend on Bingo prizes for the BVU adult Christmas party. Hollifield, BVU's Director of Marketing, replied, "Can Sandra squeeze the networks some more for some help here? How about Alcatel, etc.?" (Gov't Ex. 13, ECF No. 110-14.) Sandra referred to Sandra Munsey, who was part of BVU's marketing team. Childress thought Hollifield's statements about the networks referred to the TV cable networks, which gave BVU points that could be redeemed for goods, similar to credit card points. Childress testified that Hollifield had "wanted us to touch base with anyone that might furnish us with gifts, or any way we could get gifts to give the employees for this event without actually having to pay dollars for them." (Trial Tr. 59-60, Feb. 18, 2016, ECF No. 158.)

Like other BVU employees, Childress had received cash and pre-paid debit cards. She had received service awards in cash every five years, including a $500 award for her 30-year anniversary with BVU in 2012. That money was presented to her in an envelope at the BVU Christmas party and was not reported on her W-2. Typically, longevity awards were presented either at the Thanksgiving lunch or at the Christmas party, in front of all employees. After the investigation of BVU began, Childress received amended W-2 forms for 2012 and 2013 that included the $500 cash award and $25 each year in pre-paid debit cards for her birthday.

If Childress wanted to obtain pre-paid debit cards, she would go to Pomrenke to get it. Childress sometimes obtained the cards from Pomrenke to use as prizes for chili cook-offs or door prizes at BVU events. In most instances, when BVU gave employees pre-paid debit cards as birthday gifts, door prizes, or prizes for cook-offs or games at company events, there was no connection between an employee's work performance and receipt of a gift card.

BVU had given between $7,500 and $30,000 per year to the Barter Theatre as a sponsorship. This was part of BVU's marketing efforts in the Abingdon area, where the theatre is located. In exchange for the sponsorship, BVU received advertising, community good will, and free tickets to theatre performances. Pomrenke sometimes used the tickets to take her family members to the theatre and sometimes requested extra free tickets in addition to those that were given to BVU for the sponsorship. Lower-level BVU employees did not have access to the tickets.

On August 18, 2009, Lane sent an email to Rosenbalm, Childress, Jamey Rector, Munsey, and Pomrenke. Rector was a marketing specialist. The subject line read, "RE: ICF & 10,000 Cusotmer [sic] Funds," and the body of the email stated:

FYI, an updated list of contributors:

$1,500 from Infinera Networks coming as a check
        Dan Delisle is the contact, and his info is attached

$1,000 from Calix coming as a check
> Ken Grelck is the contact, and his info is attached

$500 from Martin Group as a check
> Reid Jenkins is the contact, and his e-mail address is ReidJenkins@Martin-Group.com

$1,000 **credit** applied to our bill from Level3
> John Reid is the contact, and his info is attached

(Gov't Ex. 85, ECF No. 110-15.) The companies referenced in the email are BVU vendors, and the listed amounts represent payments made by the vendors to BVU in support of an event celebrating BVU reaching 10,000 OptiNet customers. BVU employees, board members, and council members were invited. The event was held on BVU grounds, and food was provided. The vendors who contributed money to the event were listed on a banner that was displayed during the event. The vendors contributed funds because they were asked to make a contribution.

On June 4, 2010, Jim Clifton, a board member, emailed Pomrenke to request Barter Theatre tickets for himself, his girlfriend, Pomrenke, and her present husband. Pomrenke forwarded the request to Childress, who asked how many tickets Pomrenke needed and stated that she had already given all of BVU's Barter Theatre tickets for the year to Pomrenke and Rosenbalm. Pomrenke replied, "I think if we could get Jim one of the [two-person] passes he would be OK???" (Gov't Ex. 146, ECF No. 110-16.) Childress testified that the additional tickets were provided at no extra cost to BVU.

Pomrenke was hired by BVU approximately two years after the OptiNet business was created. OptiNet grew significantly during Pomrenke's tenure. At the time of the trial, BVU was in the process of attempting to sell OptiNet for a price of $50,000,000.

Lisa Dobrovok, a BVU accounting clerk, began handling payroll in early 2009. Dobrovok was responsible for preparing and filing W-2s, with oversight by Matthew Boothe, BVU's Controller.

When she was authorized to do so, Dobrovok entered bonus and commission amounts into the payroll system. When those amounts were entered into the payroll system, they were calculated into the employees' gross income on the employees' W-2 forms. Bonuses have not always been input into the payroll system. At the end of each year, each employee received a bonus equal to two percent of the employee's salary. Those year-end bonuses were always processed through the payroll system. For a period of time, federal and state income taxes were not withheld from the year-end bonus amounts, but BVU did withhold Federal Insurance Contributions Act ("FICA") taxes for Medicare and Social Security. Cash bonuses were not run through the payroll system until 2014, but amended W-2 forms were issued to reflect cash bonuses paid in 2012 and 2013.

On March 14, 2007, Linda Davis emailed all BVU employees at Dobrovok's direction to explain BVU's protocol for submitting meal reimbursement requests. The email stated:

> Due to Federal regulations, all meal receipts turned in for reimbursement by employees or purchased with BVU Company credit card must include the following information:
>
> 1. The purpose and description (a business lunch must include the topic of discussion or an agenda, travel must include name of seminar or class)
>
> 2. If it is a meeting, please list the names of all in attendance.
>
> Reimbursement for meals when traveling locally (such as attending a class or seminar), is considered a fringe benefit and is taxable for the employee if not staying overnight.

(Gov't Ex. 147, ECF No. 110-17.) The email was prompted by a visit from a local IRS agent. The IRS agent discussed what would be required if BVU were ever audited, and BVU was not in compliance with some of the recommended practices. Prior to this email, there were no policies or practices in place at BVU to ensure that meals purchased locally by BVU employees with BVU funds were included on the employees' W-2 forms. Pomrenke received this email. The email did not specifically address meals that were consumed on BVU premises for the convenience of BVU.

Prior to 2008, Dobrovok filed 1099 forms for some BVU employees. Typically, if a person receives less than $600 per year from a company, the company does not have to file a 1099 form. A 1099 form is usually used to report

24

payments to independent contractors. However, 1099 forms were used to report vehicle allowances for some BVU employees.

Dobrovok testified that she had never submitted W-2s that she knew were false. However, she acknowledged that she filed W-2s that were incorrect in that they did not include all taxable income. Dobrovok herself received pre-paid debit cards for her birthday and as accounting audit bonuses, and those were not included on her W-2 forms. She knew when she filed the W-2s that those amounts had not been included in her taxable income, but she did not know that the gift cards were required to be included.

Between 2010 and 2015, certain contributions to the Virginia Retirement System that should have been taxed were not taxed. For 2015, the amount of tax that should have been paid on those contributions was approximately $45,000. BVU later paid the amount that was owed.

Richard Linnen, a certified public accountant with the firm Brown, Edwards & Company, L.L.P. ("Brown Edwards"), was in charge of the BVU audit for several years. The last audit that Brown Edwards prepared for BVU was for the fiscal year ending June 30, 2013. In layman's terms, when performing an audit, Brown Edwards would look at BVU's financial statements and then look through BVU's files to verify that the documentation supports the statements. Linnen and his team would not go through every transaction, but would concentrate on larger

items when looking through BVU's records. If Linnen and his team found no material misstatements, they would issue an unmodified opinion. An unmodified opinion is not intended to certify that nothing illegal occurred.

On November 2, 2009, Rosenbalm and Pomrenke signed a letter in which they made a number of representations to Brown Edwards, including the following:

> We have no knowledge of any fraud or suspected fraud affecting the entity involving:
>
> a.  Management,
>
> b.  Employees who have significant roles in internal control, or
>
> c.  Others where the fraud could have a material effect on the financial statements.

(Gov't Ex. 100 at 111, ECF No. 110-18.) In response to a question asking them to "describe any unusual employee compensation arrangements, including any incentive compensation arrangements," Pomrenke and Rosenbalm responded, "No Incentive Compensation Plans in Effect; hourly & salary, bi-weekly." (*Id.* at 14.) Incentive compensation arrangements would include service bonuses or performance bonuses, among other things. Linnen did not recall anyone at BVU mentioning equipment recovery bonuses, audit bonuses, or any other kind of incentive compensation or performance bonuses. The audit documents from 2010, 2011, 2012, and 2013 contain the same assertion, and Pomrenke signed those

26

management representation letters as well. The auditors' concern with incentive bonuses is that a high level manager who was promised a bonus based on profitability might be inclined to pressure employees to adjust the books incorrectly in order to achieve a high level of profitability. Performance bonuses given to lower level employees in relatively small amounts are less of a concern.

For purposes of auditing BVU, misstatements become material if they total $300,000 to $400,000 in a year. An individual misstatement of $500 would not be considered material. BVU received an unmodified opinion from Brown Edwards for the years 2009, 2010, 2011, and 2012. In 2013, the opinion was made subject to the outcome of the ongoing investigation.

While Brown Edwards was performing audits of BVU, Pomrenke and Boothe were the primary points of contact. Both had responsibility for managing the general ledger and making adjustments. There were some adjusting entries during that time period, but not many. Linnen testified that BVU's accounting was fairly complex. Brown Edwards did not look at BVU's petty cash vouchers as part of the audits.

Kim Branson began working at BVU as a customer service representative in October 2007 and became an accounting clerk in January 2009. As an accounting clerk, Branson was responsible for paying amounts owed to OptiNet vendors.

27

When Rosenbalm was CEO, BVU had no meal reimbursement policy of which Branson was aware. She did not know of any BVU policy specifying what kinds of meetings were business expenses and what kinds of meetings were not. Branson testified that employees would buy themselves lunch using BVU credit cards. Pomrenke had a company credit card and charged meals to BVU. Branson received the statements for BVU credit cards. She would distribute the statements to the cardholders, who would sign the statements indicating their approval of the charges and return them to Branson with receipts for the charges. There were no requirements pertaining to the format of the receipts; some were itemized and some were not. The cardholder would indicate which department was associated with each charge, and Branson would then code each charge to the department indicated so that the funds expended would be allocated to the associated department. Initially, Branson was not expected to investigate particular charges to determine their propriety or legitimacy. Individual cardholders were trusted to ensure that charges were proper. At some point in time, Rosenbalm asked for copies of the statements, and Branson began providing copies of all credit card statements to Rosenbalm and Pomrenke. Pomrenke was in charge of accounting and controls at BVU. The defense introduced an email dated October 19, 2010, in which Pomrenke asked Rosenbalm about certain credit card charges made by other

28

employees, indicating that at least by that date, there was a practice in place for reviewing credit card charges.

In the time period between 2009 and 2012, approximately 26 to 28 BVU employees had BVU credit cards. The total amount paid by BVU for charges made on employee credit cards was sometimes as high as $50,000 per month.

The government introduced a number of statements from Pomrenke's BVU credit card showing numerous charges between December 2008 and April 2012 of small amounts at local fast food establishments and other restaurants. Many of the restaurant charges were coded to the Electric Department, which was one of BVU's four major departments. The words "working lunch" or "working dinner" were written on many of the receipts in Pomrenke's handwriting. Pomrenke regularly submitted receipts that were not itemized.

The statements also showed charges for Comcast cable services at Pomrenke's home. Pomrenke told Branson that she needed to compare the offerings of Comcast, a BVU competitor, to the services that BVU offered. During the same time period, Pomrenke also subscribed to BVU OptiNet services at her residence, and BVU did not pay for those services. The services she received from OptiNet were essentially the same services she received from Comcast.

Pomrenke's credit card statement from February 2, 2009, included rental car and hotel charges incurred in Hawaii. The rental car receipt noted a charge for a

child seat.  Pomrenke has two children.  Branson did not recall Pomrenke offering any explanation for why she charged a child seat in Hawaii to BVU.  The credit card statements also included gas station charges, although BVU has gas tanks at its facilities that can be used for company vehicles.  However, BVU policy would not have precluded Pomrenke from refueling her vehicle off-site while traveling for business.  There were also several charges billed to the administrative office supplies account.  At the time, employees were permitted to purchase office supplies on their own without going through the BVU purchasing agent. Additionally, there were charges for satellite radio service in Pomrenke's company vehicle.  Branson was not aware of any other BVU employee for whom BVU paid for satellite radio service.

In July 2006, BVU purchased Pomrenke's personal vehicle, discontinued her vehicle allowance, and allowed her to use the same vehicle as her company vehicle.  The vehicle had been financed in the name of Pomrenke's ex-husband, Mr. Bright.  In response to a government subpoena, Pomrenke drafted a memorandum that stated:

> On 07/07/2006 Purchase order 12012-000 was issued to Stacey (Bright) Pomrenke (vendor # 946) for the approved purchase of a 2004 Chevy Tahoe in the amount of $31,000.00.  Stacey (Bright) Pomrenke's vehicle allowance was discontinued after the purchase of the vehicle.  On 06/17/2008, there was a debit and a credit entered to clear the outstanding purchase order, due to payment was never issued to Stacey (Bright) Pomrenke.  Check #16001 dated 7/10/2006 was issued directly to Community Trust Bank for $31,558.56.

Prepared by Kim Branson

Accounting Clerk

(Gov't Ex. 149, ECF No. 113-27.) Branson testified that she did not prepare the memorandum. Rather, Pomrenke prepared it to accompany documents being produced to the government. Branson was present at Pomrenke's desk when Pomrenke prepared the memorandum. Branson had no personal knowledge about the vehicle purchase; she did not work in the accounting department at the time of the referenced events. Pomrenke asked to sign Branson's name to the document, which made Branson uncomfortable. Branson was able to verify the accuracy of the document by looking at the referenced purchase order and check.

At Pomrenke's instruction, in response to a government subpoena, Branson created lists showing the total amounts charged to BVU credit cards per employee cardholder from April 2 through December 31, 2012, and from January 1 through September 30, 2013. During the 2012 time period, BVU employees charged a total of $278,873.09, and Pomrenke charged $4,392.69. During the 2013 time period, BVU employees charged a total of $240,704.20 to BVU credit cards, $2,181.13 of which was charged by Pomrenke.

JoAnne Nolte, an attorney who has represented BVU in regulatory matters, testified that she was initially retained by BVU in early 2000. Nolte has never responded to a request for proposals ("RFP") or participated in any kind of

31

competitive bidding process in order to do work for BVU. In 2010, Nolte billed BVU approximately $20,000 for work she performed. In 2011, she billed BVU approximately $11,000, and in 2012, she billed BVU approximately $15,000.

Nolte owned a beach house in Nags Head, North Carolina. She allowed Pomrenke, Rosenbalm, and Jim Kelly, a BVU board member, to stay at her beach house free of charge. Nolte testified that she had never charged anyone to use her beach house. She believes Rosenbalm once asked if his mother could use the beach house. Nolte testified that she did not think there was anything wrong with allowing high-ranking BVU officials to use her beach house while BVU, a governmental entity, was her client. She could name only one other governmental client and no representative of that client had ever requested to use her beach house.

The government introduced an email exchange between Pomrenke and Nolte in August, 2011, in which Pomrenke asked whether Paul Hurley, a member of the BVU Board of Directors, could use Nolte's beach house. Pomrenke also mentioned a business-related matter in the same email. Nolte responded that her beach house was unavailable during the requested week, but offered different dates during which Hurley could use the house. Pomrenke asked if Hurley could visit during one of the time periods offered. In a reply email discussing maid availability and cleaning cost for the house, Nolte wrote, "Wes had better be

sending me a really nice gift for this as I know he is making you do this!" (Gov't Ex. 150, ECF No. 113-28.) Nolte testified that this statement had been a joke. In another email sent a few minutes later, Nolte wrote, "Between you and me, I don't want Wes offering my house to others, it is not appropriate." (*Id.*) Pomrenke responded, "I agree and he put me in a bad place to ask – I WOULD NEVER ask for such a thing……:( Some people just do not care!" (*Id.*) Nolte replied, "It only proves that he simply views me as a servant; my problem is that it has been a long time since I was paid anything for this." (*Id.*) Nolte did not have any relationship with Hurley and does not know what he looks like, but she did know that he was a BVU board member. Although Hurley's request made her uncomfortable because she did not know Hurley and did not like the idea of a stranger using her beach house, she was still willing to let Hurley use the house because Pomrenke was making the request. Nolte testified that she had not received any work from BVU or heard from anyone at BVU in a long time, so the request seemed to be out of the blue. Nolte stated that she had known Pomrenke for many years, long before she began doing work for BVU, and had both a business and a personal relationship with Pomrenke. Nolte testified that she had never felt that her continued business relationship with BVU was conditioned upon allowing anyone to use her beach house.

Benjamin Rush Powers, Jr., owner of the Burke Powers & Harty Insurance Agency ("BPH"), testified that his agency had insured BVU for decades. BVU ranked in the top five of BPH clients in terms of premium payments and in the middle of BPH's clients in terms of profitability. BPH provided worker's compensation, automobile liability, property, general liability, and umbrella insurance coverage for BVU. Powers inherited the BVU account in 2007 and was in contact with either Pomrenke or Griswold on a monthly basis. Cincinnati Insurance Company was the underwriter for BVU's insurance policies. Powers sent premium invoices to Pomrenke and spoke with Pomrenke about acquiring additional coverage.

On two occasions, Pomrenke asked Powers to provide her with tickets to Cincinnati Reds baseball games for Pomrenke and her family. BPH had to pay for the tickets. Pomrenke never offered to reimburse BPH for the cost of the tickets. Powers believed that the law allowed gifts from vendors to public officials as long as the gifts totaled less than $500 per year. This was because when BPH gave Rosenbalm a larger number of tickets whose value exceeded $500, Rosenbalm's wife sent him a check for the amount in excess of $500, and Bundy sent a letter quoting a BVU policy that limited acceptance of gifts to no more than $500 per employee per year. The cost for four tickets to a Reds game was approximately $272. The government introduced an email from Pomrenke and Powers in which

Pomrenke discussed the receipt of Reds tickets and also discussed the renewal of BVU's insurance policies in the same message. Powers testified that he bought the tickets for Pomrenke because she was a personal friend and because he wanted to maintain good will and keep BVU's business.

To obtain business from BVU, BPH had to submit proposals in response to requests for proposals every three years. If Powers had a question about a proposal, he would contact Pomrenke. An independent third party acted as a consultant to BVU in requesting and reviewing the proposals.

In January 2011, Cincinnati Insurance wanted to cancel Pomrenke's personal automobile insurance policy because she had incurred a claim of approximately $11,000. Powers sent the following email regarding Pomrenke to an employee of Cincinnati Insurance:

> Beth,
>
> This is one you're going to have to continue writing for us. Stacey is the CFO for the BVU Authority, which is with you . . . .
>
> She's also seen to it that we're writing MI Connections in North Carolina. . . .
>
> We have a very strong working relationship with CI's adjusters, loss control, etc on this risk.
>
> By the way Cincinnati has written her Personal Lines longer than we've had it. She was with an agency prior – see attached.
>
> Stacey has remarried. Her husband is a close friend of mine and an attorney in town.

Please confirm you'll continue with this for us.

Thank you,

Rush Powers

(Gov't Ex. 53, ECF No. 113-9.)   MI Connections was an internet connectivity project in which BVU was involved.   Pomrenke wanted consistency in coverage forms between BVU and MI Connections, so she put Powers in contact with MI Connections.   She did not actually sign any contracts for BPH coverage of MI Connections.  Following Powers' email, Cincinnati Insurance changed Pomrenke's rating and increased her rates, but did not cancel her insurance policy.   In Powers' view, it is part of his job to fight for a client in a situation where the underwriter is considering canceling the client's coverage.   Pomrenke did not ask Powers to send the email and did not know that her policy was in jeopardy.

Since Rosenbalm left BVU, BPH has not provided any tickets to the new CEO of BVU, and BPH is no longer BVU's insurance agency.   Powers testified that he did not provide the Cincinnati Reds tickets out of any fear that he would otherwise lose BVU's business.   Powers also gives his clients and friends University of Tennessee football tickets from time to time, and he does not do that out of any fear of economic loss.

The government also called as a witness Jeff Ervin, who is employed by a company called ViaMedia that sells advertising for cable television providers.

36

ViaMedia would sell advertising time to businesses, paying a portion of the proceeds to BVU and retaining a portion for itself. Ervin began working with BVU around 2010. ViaMedia previously had a contract with MI Connection to sell advertising, and MI Connection introduced ViaMedia to BVU. Pomrenke was Ervin's main point of contact within BVU. Ervin dealt with Pomrenke when he was initially trying to get BVU to do business with ViaMedia. Prior to 2011, BVU had worked with a different company, Prime Media.

On July 6, 2009, Pomrenke sent an email to Ervin in which she stated, "in the negotiations you had mentioned that you had very good seats for Keeneland. I know they race again in October – would you have room for some people from Bristol and MIC?" (Gov't Ex. 61, ECF No. 113-14.) Keeneland is a horse racing track in Kentucky. At the time this email was written, ViaMedia was not yet in negotiations with BVU. The email was referring to negotiations with MI Connections.

Pomrenke helped ViaMedia to win the business of Bristol Tennessee Essential Services ("BTES"), the Bristol, Tennessee, municipal utility, because it would be mutually beneficial for both BTES and BVU to use the same advertising service. On March 3, 2010, Ervin sent an email to Pomrenke in which he wrote, "Just wanted to follow up again to see about when we could get together with Bristol, TN and on a proposal for BVU?" (Gov't Ex. 62, ECF No. 113-15.)

37

Pomrenke replied, "I will work on getting that together this week." (*Id.*) Ervin testified that he did not know whether Pomrenke ever got in touch with BTES, and that she had not arranged or attended any meeting with Ervin and BTES. Pomrenke told Ervin that she had made a phone call to BTES.

On December 20, 2010, Ervin sent Pomrenke an email stating the following:

I wanted to thank you for taking the time to do the call last week. I appreciate you helping to push BTES to make a decision. Hopefully, we can get something done sometime early next year. Have a very Merry Christmas and a Happy New Year!! Thanks again for everything.

(Gov't Ex. 63, ECF No. 113-16.) Pomrenke responded, "Thank you Jeff. Let's hope they can find a way out before November!!!! Merry Christmas …. so what was ViaMedia's Christmas gifts this year to its customers……??" (*Id.*) Ervin replied, "It is a surprise, you should get it in the next day or so!" (*Id.*) The Christmas gift was either a bottle of Woodford Reserve or a box of chocolates. The contract between BVU and ViaMedia was not signed until December 31, 2011, more than a year later.

On September 28, 2011, Pomrenke emailed three of her BVU colleagues, Hollifield, Lane, and Munsey, and stated:

I am ready to pull the trigger on the ViaMedia contract. With that we would need to spend approx. $52k to get our headend ready – we will be inserting on more channels.

Kyle, Mark and Sandra --- are you ready to proceed with ViaMedia – any hesitations?

38

(Gov't Ex. 60, ECF No. 113-13.) Pomrenke then forwarded that email to Ervin with the note, "Hopefully soon☺." (*Id.*) Several weeks later, on October 21, 2011, Ervin wrote to Pomrenke regarding the "BTES—IPTV Launch" and stated, "Thanks. By the way it looks like they may sign a contract with us in the next week. Go figure!" (Gov't Ex. 64, ECF No. 113-17.) Pomrenke replied, "Glad I pressured them, huh? My RFP is going out on Monday. Are they not issuing a RFP????" (*Id.*) On October 26, 2011, Pomrenke emailed Ervin to ask whether he had received the RFP. Ervin responded, "Got it." (Gov't Ex. 65, ECF No. 113-18.)

Ervin sent Pomrenke Christmas gifts three or four years in a row. On November 16, 2011, in response to an email from Pomrenke, Ervin replied, "By the way we got 5 tickets to a UK game, I think December 20th. Should I have them sent to you?" (Gov't Ex. 66, ECF No. 113-19.) Ervin testified that Pomrenke had asked him for tickets. Pomrenke replied, "Yes, but let's wait until we award the RFP – I do not want it construed as a gift during our process. Make sense?" (*Id.*) Ervin responded, "It does." When asked at trial, "What is the problem of giving gifts during the RFP process?", Ervin stated, "Well, I guess you wouldn't want to give somebody a gift during the RFP process. . . . To try not to influence it." (Trial Tr. 160, Feb. 19, 2016, ECF No. 161.)

On December 22, 2011, Pomrenke sent Ervin the signed contract between BVU and ViaMedia in an email stating, "Merry Christmas !!!  For the record – can we do something other than bourbon next year:)"  (Gov't Ex. 67, ECF No. 113-20.)  Ervin responded, "For sure, thanks a ton and Merry Christmas to you, are they overnighting the hard copies?"  (*Id.*)  Ervin provided Pomrenke with another Christmas gift that year, before the contract went into effect on December 31.  Over the years, Ervin has also given Pomrenke and Rosenbalm tickets to other sporting events.  On August 1, 2012, ViaMedia's Vice President of Marketing sent Pomrenke four tickets to Keeneland for October 6, 2012, which cost a total of $80.

On September 17, 2012, in response to an email transmitting BVU's monthly report from ViaMedia, Pomrenke wrote to Ervin, "Jeff, have you been getting my emails regarding Keenland? I hate to be a pest…."  (Gov't Ex. 69, ECF No. 113-21.)  Ervin replied, "I think Becky got ya'll some tickets.  We don't have a suite there.  I am copying her on this e-mail," to which Pomrenke replied, "I thought you told me that you had a suite there??"  (*Id.*)  Ervin responded, "No mam, sorry, we don't have one, they are very limited.  We just get tickets."  (*Id.*)  Pomrenke then wrote on September 20, "Got it☺ thank you!  BTW – did you tell me you could get Charlotte Panthers football tickets?", to which Ervin responded, "For you , we can get them, just let me know."  (*Id.*)  The next day, Pomrenke wrote, "Did you get the game that I need – can you do that?:) THANKS!!"  (*Id.*)

40

When asked what he meant regarding the Panthers tickets, Ervin stated, "She's a good client. We can get tickets for her." (Trial Tr. 170, Feb. 19, 2016, ECF No. 161.) ViaMedia ultimately did get Pomrenke the football tickets she requested.

Ervin testified that he never gave anything to Pomrenke or BVU out of fear that failure to do so would result in an economic loss, nor did he provide anything with the intent of influencing Pomrenke's decisions about anything. Ervin testified that while ViaMedia had to buy the Keeneland tickets, the Panthers tickets and other sporting event tickets were given to ViaMedia at no cost. ViaMedia gives tickets to other customers as well, as a means of building good will. ViaMedia sent Christmas gifts to several other BVU employees in addition to Pomrenke.

BVU's advertising revenue increased significantly with ViaMedia over what it had been when BVU was working with Prime Media. Rosenbalm, rather than Pomrenke, was the BVU representative who signed the contract between BVU and ViaMedia. ViaMedia works with other government agencies, but none of those public entities have ever asked him to provide complementary tickets to sporting events.

Rick Tarvin, Regional Vice President of ViaMedia, managed BVU's local advertising sales for a time. On September 24, 2012, in response to a request from Jeff Ervin, Tarvin sent Pomrenke an email offering her tickets to a Carolina Panthers game. Tarvin's office was located in Kentucky. Pomrenke responded

41

that she would take the tickets.  Tarvin stated that he did not give the tickets with the intent of influencing any decision by BVU, nor did he fear that ViaMedia would suffer economic loss if he did not give Pomrenke the tickets.

Larry Shaver, regional Marketing President for BB&T Bank, testified that BVU has been a client of BB&T since 2002 or 2003.  BVU maintains its primary operating account with BB&T and is a significant client of the bank, maintaining an average balance in the $10,000,000 range.  Shaver is the relationship manager for BB&T, and part of his job is to keep the client happy.  For six years, BB&T provided four suite tickets per year to NASCAR races at the Bristol Motor Speedway to BVU and the tickets were delivered to Pomrenke.  Shaver testified that Pomrenke's father used one of the tickets, and he is not a BVU employee.

On August 22, 2011, Shaver sent the following email to Pomrenke:

I have two tickets to the BB&T suite for the Friday night Race for you (BVU).  At this point I am not sure I will have Sat. tickets available as our corporate office in Winston Salem has claimed several unexpectedly.  Should a couple of Sat. tickets become available you are at the top of our list.  I will drop the Friday tickets off at your office later today.

(Gov't Ex. 52, ECF No. 113-8.)  Pomrenke responded, "How can one of your best customers not get suite tickets for the Saturday race?"  (*Id.*)  Fifty minutes later, Shaver wrote:

OK.  With the help of Debbie Cole we have been able to snag two tickets from the "corporate" Group.  I will not have those until later

42

this week.  I will wait and bring both sets of tickets later this week unless you need the Friday ones earlier.

We really do appreciate your business.

(*Id.*)  Shaver's office is in Tennessee, and Pomrenke's office is in Virginia.  Shaver testified that he never gave anything to Pomrenke or BVU for the purpose of influencing any decision, nor did he ever fear that if he failed to give something, BB&T would suffer an economic loss.

Keith Simms is employed by Nokia Group, a telecommunications manufacturer that was formerly known by the names Alcatel and Alcatel Lucent. He is an account executive who sells products and services, and he worked with BVU in 2009 and 2012.  In that role, his goal was to sell BVU products and services and keep BVU happy as a customer.  In November 2012, Alcatel was selling equipment to BVU to connect fiber optic services to homes.  It was important to Simms to keep the BVU account.  On November 7, 2012, Lane sent Simms an email with the subject "Solicitation of sponsorship" that stated:

> Thanks for taking my call earlier.  We generally ask our long-established vendor partners for help this time of year in subsidizing various employee Thanksgiving and Christmas events.  I would like to ask your consideration this year in subsidizing our Children's Christmas party @ $5,800.  This will help provide food and gifts to employee children up to 12 years old, and provide a great opportunity for ALU to gain good will and press within and without the BVU organization.  We will be glad to advertise your gracious sponsorship in some way that is beneficial to you, so let me know if you'd like to discuss this further.

Please let me know tomorrow what you are able to do toward this request, and thank you in advance.

(Gov't Ex. 151, ECF No. 113-29.) Alcatel paid the money. It was important for Simms to maintain the good will of BVU.

Simms testified that he had never felt pressured or compelled to provide the money for the children's Christmas party. He never felt that the gift would influence any particular decision, "other than to stay in the good graces of the customer." (Trial Tr. 206, Feb. 19, 2016, ECF No. 161.) He did not fear that failure to pay the money would result in an economic loss to Alcatel. Simms thought the event was a charity event and did not realize it was solely for the children of BVU employees. Though Alcatel sponsors various charity events, Simms has never been asked to sponsor a party for any other government entity.

Molly Moeck was an intern at BVU from 2009 until 2010, and she worked as a contractor for BVU from July 2010 until the spring of 2011, and again during the summer of 2011. She was the NTIA grant administrator. Moeck testified that BVU had received approximately $22,000,000 in federal funds under the Recovery Act, as well as additional federal and state funds. BVU received the federal NTIA Grant funds in July 2010, and it was a three-year grant, so the funds were fully expended in June 2013.

As part of her grant administration duties, Moeck met with a team of BVU employees who worked on the grant-funded project. The team included Pomrenke,

44

Rosenbalm, Dale Blevins, Dobrovok, Copeland, and Mike Clark. This was the decision-making team. Moeck compiled and delivered information to the team so that it could make decisions about the project, including financial and procurement decisions. Pomrenke was on the team for the entire duration of the grant.

As a public entity, BVU must comply with the Virginia Public Procurement Act ("Procurement Act"), which requires a particular bidding process for the awarding of contracts. *See* Va. Code Ann. §§ 2.2-4300 through -4377. The grant requirements prohibited gratuities from and favors to contractors and required BVU to comply with the Procurement Act. The Procurement Act also prohibits contractors and vendors from giving gifts to BVU employees. The grant compliance rules were discussed during team meetings. If Moeck had a question about accounting or finance, she would talk to Pomrenke. When an RFP was issued for construction, Copeland was heavily involved in the decision-making process, but Moeck does not know who made the final decision. Everyone on the executive team weighed in. The executive team was Rosenbalm, Pomrenke, and Copeland. Clark also had input. Most of the grant money was used for construction. The team looked to Copeland, the construction expert, for advice on which bidders could perform the best construction services. Moeck testified that Pomrenke had no expertise in the construction business. Pomrenke's area of expertise was finances and accounting.

45

Robin Griswold, wife of Brad Griswold, worked as an event coordinator and fundraiser for Tri-Cities Christian School ("TCCS") from August 2009 through December 2010. The Griswolds, Rosenbalm, Pomrenke, and Lane all had children who attended TCCS. TCCS is a private, nondenominational Christian school. It participated in a competition through a local shopping mall in which the school that registered the greatest amount of mall purchases during a particular time period would win a cash prize. Purchases of pre-paid Visa debit cards were worth triple points in the contest, so the school encouraged its students' families and friends to purchase pre-paid debit cards.

On September 2, 2010, Pomrenke sent an email to Rosenbalm's wife and Robin Griswold and copied Rosenbalm, Childress, Boothe, and Branson. The email stated:

> BVU will purchase $2,000 in the Visa Gift Cards. We will use these as budgeted means to incent our CSR's for their upselling efforts through this calendar year and to provide gift cards for employees at employee functions (picnics / Christmas party), etc.
>
> I will need them in the following denominations:
>
> (10)  $25.00, (13) $50.00, (11) $100.00.
>
> Who do I need to make the check payable to :  Johnson City Mall?

(Gov't Ex. 15, ECF No. 116-2.) BVU did purchase the pre-paid debit cards; TCCS got credit for the card purchase and ultimately won a $10,000 award that year. A two dollar service fee is assessed on each pre-paid debit card. Pomrenke had made

a similar purchase of pre-paid debit cards on behalf of BVU in September 2009, totaling $2,000 for the cards themselves plus $100 in fees. TCCS had won a cash prize in the contest in 2009 as well. On September 2, 2011, Pomrenke emailed Rosenbalm's wife and Robin Griswold, stating, "I am hoping to get to the mall today to purchase $2500 in gift cards for BVU to use for employee incentive plans, etc." (Gov't Ex. 16, ECF No. 116-3.) Robin Griswold attended some BVU events and saw the cards distributed as prizes for BVU employees.

Robin Griswold was personal friends with Pomrenke and testified that Pomrenke did not have a personal vehicle between 2007 and 2012. She drove her BVU vehicle everywhere, including for personal use. Robin Griswold once rode with Pomrenke in the BVU vehicle to a school field trip with their children. Robin Griswold witnessed Pomrenke's husband driving the BVU vehicle for personal purposes more than ten times.

Matthew Boothe, the BVU Controller and a certified public accountant, reported directly to Pomrenke for ten years. Pomrenke's compensation, consisting of her base salary, bonus, and any taxable life insurance, was $137,420.56 in 2008 and rose to $220,773.56 in 2014. The value of her vehicle use was not calculated for the years 2008 through 2011, but her vehicle allowance was included in the 2014 compensation total. Pomrenke was in charge of BVU's finances. If Boothe

wanted to change an accounting practice, he would have to obtain Pomrenke's approval.

Between 2009 and 2014, BVU paid BPH $2,232,899.62. In 2009, BVU paid the Country Club $12,532.26 for memberships for Rosenbalm, Pomrenke, and Bressler. Pomrenke reimbursed BVU $371.45 and $1.34 of that total. In 2010, BVU paid the Country Club $12,053.11 for memberships in the names of Pomrenke and Bressler. In 2011, BVU paid the Country Club $13,438.06 for memberships in the names of Pomrenke, Bressler, and Brian Ritz, and for food minimum charges for Pomrenke. Pomrenke's husband's name also appeared on invoices from 2011, but it is unclear from the evidence whether BVU paid any additional amount for his Country Club membership and use. In 2012, BVU paid a total of $12,921.29 for memberships in the names of Pomrenke, Bressler, and Ritz, and for food minimum charges for Pomrenke. In the first three months of 2013, BVU paid $3,941.26 to the Country Club for memberships in the name of Pomrenke and Bressler and food minimum charges for Pomrenke. These Country Club memberships were included on the affected employees' W-2 form for the year 2015, but they were not included on the W-2 forms for previous years.

Boothe did not have a company credit card and did not charge his lunches to BVU when he had to work through lunch. Pomrenke often charged her lunches to BVU and sent other BVU employees to buy her lunch.

When a payment to an employee is run through the payroll system, taxes are withheld and the payment is included on the employee's W-2 and reported to the IRS. BVU had a practice of giving employees service awards and bonuses that were not run through the payroll system and were not reported to the IRS. Boothe acknowledged that it was not right to give employees payments without running them through the payroll system. Boothe mentioned to Pomrenke that it was improper for BVU to give pre-paid debit cards to employees outside of the payroll system. Between November 2003 and November 2008, BVU provided $54,820 to employees in cash and pre-paid debit cards, outside the payroll system. Between 2009 and 2013, the total was $49,825. No FICA or income taxes were withheld from these payments. Boothe was afraid to complain about this issue to anyone other than Pomrenke because he did not want to get in trouble.

Law enforcement began investigating BVU in the fall of 2013, and in April 2014, BVU issued amended W-2 forms to its employees for the years 2012 and 2013 that included the cash and pre-paid debit card payments. BVU issued corrected W-2s for select employees for the years 2010 through 2014. Pomrenke approved all forms that were submitted to the IRS, including 941 forms, which are used to report quarterly payroll taxes. Pomrenke was aware that payments had been made to BVU employees outside the payroll system and that those payments were not reflected on the forms filed with the IRS, but she approved the forms

49

nonetheless.  BVU never amended its tax filings to account for personal use of BVU vehicles or Country Club memberships.

Boothe regularly witnessed Pomrenke using her BVU vehicle for commuting to work.  Boothe knew that personal use of a company vehicle, including commuting use, was a taxable benefit to the employee.  He told Pomrenke in approximately 2010 or 2011 that he was concerned that personal use of company vehicles was not being reported to the IRS.  On February 28, 2011, Pomrenke sent an email to Boothe stating, "the City just had a 941 audit …. please research and prepare a detailed memo to me on things we need to do to be compliant.  Please have this to me by the end of the week." (Gov't Ex. 11, ECF No. 116-22.)  On March 4, 2011, Boothe sent Pomrenke an email stating the following:

> From my research the areas that we are not compliant are in the Personal Use of Employer Provided Vehicle and Cash Bonuses.  We currently do not include any of the benefit of personal use of company vehicles in employee wages.  Most of our vehicles would be exempted from this (bucket trucks, service trucks and vans), however, the normal pick up trucks and SUV's would need to be included.  We would probably have to do one of two types of programs to capture this.  The first is by following the commuting rule.  This rule state that we would include the amount of the commute multiplied by $1.50.  To use this, there needs to be a policy in place that states the only personal use of a company vehicle is for commuting purposes only.  De minimis personal use is allowed, for example, stopping at the grocery store on the way home from work.  For highly compensated employees (over $110,000 per year) we would probably have to use the Lease Value Rule.  This states that we would take the annual lease value of the fair market value of the vehicle and multiply this by the

percentage of personal use of the vehicle. This means that mileage would need to be tracked in order to substantiate the business/personal mileage breakout.

All cash bonuses are taxable and need to be included in employee wages. Cash safety and length of service awards are tax exempt up to $400.

I believe we are ok on the paper work that we maintain in employee files and payroll records.

I would like to speak with Brown Edwards before we implement any changes to make sure that we are doing things correctly.

(*Id.*)

Pomrenke did not make any changes with respect to personal use of employee vehicles until mid-2012, more than a year after the email was sent. Boothe did not believe he could make any changes on his own because he feared he would get in trouble and possibly lose his job. He testified that he had been primarily afraid of Rosenbalm, but he also had been afraid that Pomrenke might terminate his employment.

On April 8, 2011, Pomrenke wrote to Boothe:

please provide me 5 – 8 examples of employees who drive company vehicles – try to capture all possible scenarios with our employee base who has company cars, including OptiNet engineers who take a car home on call. Please have Wes as one of the examples.

Can you do this Monday? Thanks.

Have we gotten any type of notice of another 941 audit?

(Gov't Ex. 156, ECF No. 116-23.)   In response, Boothe prepared and sent

Pomrenke a spreadsheet calculated the taxable benefit to a sampling of employees,

about which he stated:

> I've left the control employee section blank for you and Wes.  This is
> going to come down to how you interpret the regulations.  Under one
> method you two do not qualify as control employees, but there is a
> second definition which includes highly compensated employees as
> control employees. The two of you fall under this second definition.
> Either way, neither of you qualify for the commuting method so it
> doesn't matter at the end of the day.  The FMV on the date our
> vehicles were first made available to our employees kicks us out of
> the cents per mile method. . . . On the far right of the schedule is the
> lease value method.  The lease value was obtained from the IRS
> instructions.  I just dropped some numbers in to calculate the personal
> use of the vehicle.  The lease value amount does include the cost of
> fuel provided by the company.  I calculated this on the assumption
> that all of the gas used by the employee was paid for by the company.

> Please let me know what questions you may have.

> As of today, we haven't received any audit notice from the IRS.

(*Id.*)   Boothe estimated that Pomrenke was receiving a taxable benefit of

approximately $9,000 per year in the form of personal use of her BVU vehicle.  In

response to this email and spreadsheet, Pomrenke did not direct Boothe to take any

action to account for that taxable benefit to her or to other employees.  BVU's tax

filings for 2011 did not reflect personal use of BVU vehicles.  On February 1,

2012, in response to a request from Pomrenke, Boothe wrote a memorandum to

Pomrenke regarding personal use of BVU vehicles and possible consequences of

BVU's failure to include the personal use benefit on employees' pay records.

On July 25, 2012, Boothe sent Pomrenke an email regarding vehicle allowances in which he stated, "Just got in touch with Brown Edwards and they confirmed that it should be recorded on the W-2, not the 1099." (Def. Ex. 22, ECF No. 116-38.) Boothe testified that the need to report vehicle allowances on W-2s rather than 1099s was new information to him at that time.

BVU did eventually change its practices and procedures with regard to personal use of vehicles in 2012, after Boothe told Pomrenke that he would not certify to the auditors that BVU was in compliance with all laws and regulations. Pomrenke spoke to Rosenbalm about the issue and the practice was changed. BVU began to calculate the taxable portion of vehicle use, and that amount was included on employees' pay stubs going back to January 1, 2012. Employees received disclosure forms asking them about their company vehicle usage, and Boothe used their responses to calculate their taxable benefit. Pomrenke estimated that she used her BVU vehicle for personal purposes 65% of the time. Lane reported 57% personal usage, Bundy reported 75% personal usage, and Rosenbalm reported 33% personal usage.

In 2012, Boothe was involved in preparing and billing Alcatel for the BVU children's Christmas party. Either Lane or Pomrenke told him to prepare the invoice. BVU billed Alcatel $5,800 for the party.

On July 10, 2006, BVU issued a check to Community Trust Bank in the amount of $31,558.56. The check paid off a vehicle loan held in the name of John Bright, Pomrenke's ex-husband. Boothe believed that Pomrenke and Bright were still married in July 2006. BVU purchased the vehicle that Pomrenke had been driving as her personal vehicle and then assigned it to her as her BVU vehicle. Boothe was not aware of any other employees or their spouses for whom BVU paid off vehicle loans.

Boothe discussed several petty cash receipts that reflected payments of cash to employees for service awards and bonuses. On May 4, 2009, Pomrenke emailed Leslie Heckford and copied Linda Davis and Boothe, stating, "Leslie, can you please provide me $500 from your petty cash balance. Linda, this will be paid to a BVU employee as a bonus for OptiNet (set top box recovery). For each $26k in set top boxes recovered a $500 bonus is paid." (Gov't Ex. 21, ECF No. 116-31.)

On December 8, 2010, Pomrenke and Boothe exchanged a series of emails regarding an audit bonus. Pomrenke wrote, "Matthew, I really would like to give VISA gift cards to everyone for their bonus---do you feel strongly we need to run it through payroll?" (Gov't Ex. 19 at 3, ECF No. 116-32.) Boothe responded, "Visa cards are easier, but they are still taxable income. If we run it through payroll, that removes any potential liability on this." (*Id.*) Pomrenke then wrote, "We would not have the liability if the employee knew they needed to add it to their income,

54

right?" to which Boothe replied, "We would for the employer portion of Social Security and Medicare." (*Id.*) Pomrenke responded, "so, what do you want to do?" and Boothe wrote back, "I recommend that we run this through payroll. I know that this will mean smaller checks for everyone, but it keeps everything above board." (*Id.*) Pomrenke then wrote, "Please process this bonus for the ones listed below. Let me know, I want to distribute the check stubs." (*Id.* at 2.) Several additional emails were exchanged, and then Pomrenke wrote, "do you think they will be surprised and happy?" to which Boothe replied, "Yes. They'll give me grief for taking taxes out on it, but other than that, they will be excited." (*Id.* at 1.) Pomrenke responded, "I would still rather do gift cards☹," and Boothe replied, "I would to, but technically running it through payroll is the right thing to do." (*Id.*)

BVU did not fully cease providing pre-paid debit cards to employees until several years after this email exchange. On January 25, 2011, Pomrenke again sent an email on which Boothe was copied asking for cash to pay employee incentive bonuses. On October 4, 2011, Rosenbalm sent an email to Dale Blevins and copied Pomrenke and Boothe asking for pre-paid debit cards to give to employees as birthday gifts. Boothe responded, "We don't have any cards in accounting," and Pomrenke replied, "I have them in my bottom desk drawer on the left." (Gov't Ex.

118, ECF No. 116-34.) Boothe then wrote, "There are 34 in there in a variety of amounts." (*Id.*)

On June 27, 2013, Boothe wrote to Pomrenke, "Per IRS Publication 15-B, Employer's Tax Guide to Fringe Benefits, cash and cash equivalent benefits, no matter how little, are never excludable as a de minimis benefit. Below is the actual text from the publication." (Def. Ex. 11, ECF No. 116-35.) Pomrenke responded, "So what are you recommending we do?" (*Id.*) Boothe wrote back, "To be compliant, these amounts need to run through payroll. The gift cards/bonuses/achievements could still be given to the employee, but the value of the card would have to be added to their W-2." (*Id.*) Pomrenke replied, "Sounds good. I agree." (*Id.*)

When Boothe gave Pomrenke W-2s to approve, he never specifically told her they were incorrect. Prior to the beginning of the investigation of BVU, Boothe never spoke with Pomrenke about taxability of Country Club memberships.

From the time Boothe started working at BVU in 2005 until 2013, BVU reported certain employee fringe benefits on 1099 forms instead of on the employees' W-2 forms. Boothe testified that employees who receive fringe benefits of less than $600 per taxable year need not be issued a 1099 form. The benefit of reporting something on a 1099 rather than a W-2 is that no taxes are

withheld on a 1099, but 1099s are supposed to be used for independent contractors, not for employees.

Boothe himself made a mistake in setting up the Virginia Retirement System contributions in the BVU payroll system that resulted in unpaid FICA taxes of $119,534.16 for a six-year period. Boothe testified that the mistake was his, not Pomrenke's. When he was notified of the issue, he verified the problem and took responsibility for it.

On four or five occasions, Boothe received NASCAR tickets to the BB&T suite from Pomrenke. He did not report the value of those tickets on his individual tax return. He did not know whether they were taxable.

Leslie Czech, an employment tax specialist with the IRS, provided summary and expert testimony on behalf of the government. She was asked to review BVU's business records and determine whether BVU underreported its employees' compensation, and if so, to calculate the extent of underreporting. She concluded that BVU had underreported cash and cash equivalent bonuses and gifts, personal use of BVU vehicles, and Country Club memberships for personal use. A pre-paid debit card is a cash equivalent because it can be used like cash at most stores and establishments. A store-specific gift card is also considered by the IRS to be a cash equivalent. Cash and cash equivalents transferred from an employer to an employee for the benefit of the employee are always included in the employee's

taxable income, according to the applicable Treasury regulation and IRS publications.  The W-2s issued by BVU for the years 2003 through 2011 did not report cash and cash equivalents given to employees.  BVU did not initially include cash and cash equivalents on the 2012 or 2013 W-2s either, but they later amended those W-2s to include the cash and cash equivalent payments.

Czech testified that under the applicable Treasury regulation, the value of personal use of an employer-provided vehicle is taxable income to the employee.  She reviewed BVU records to determine which executives had company vehicles, and she calculated the value of each employee's personal vehicle use by applying the automobile lease value rule.

Regarding the Country Club memberships, Czech stated that in order for the amounts paid for each executive's membership to be excluded from the executive's income, the executive must substantiate business use of the membership.  Personal use of a Country Club membership should be included in the employees' income because they received a benefit by having the employer pay the Country Club dues on their behalf.  The Country Club invoices in this case contained evidence of personal use, including notations regarding fitness, meals, and racquet ball.  The value of this personal use was not included on the employees' W-2 forms.

Czech explained her calculations of underreported income.  Regarding personal use of vehicles, she only had the employee-provided percentages from

2012; she did not know each employee's personal use percentage for prior years. Therefore, in her calculations, she assumed that the personal use percentages in prior years were the same as in 2012. She commonly makes these kinds of assumptions when doing audits of taxpayers because taxpayers often do not have all of the relevant records for every year. In this case, BVU's business records did not contain any substantiation of business or personal use for years other than 2012. While certain infrequent, de minimis personal use, such as stopping for lunch on the way to a meeting, is excludable from income, taking the employee's children to a school field trip would not be considered de minimis personal use.

Czech calculated the total amount of unreported income subjected to Medicare and federal income tax withholding as $246,513.44, and the total amount subjected to Social Security withholding as $110,479.79. She calculated the unpaid Medicare tax liability to be $7,167.09; the unpaid federal income tax liability to be $61,760.86; and the unpaid Social Security tax liability to be $13,361.62. Czech testified that BVU's underreporting resulted in $82,289.57 of total tax liability. Czech also calculated Pomrenke's personal underreported income for 2009 through 2013 based on the Country Club membership and vehicle usage, but excluding any cash or cash equivalent bonuses. She determined that the total amount of Pomrenke's income not reported on her W-2 and W-3 forms was $49,534.80, resulting in additional tax due and owing of $15,450.06. An

59

additional consequence of failing to report income is that the employee does not get credit for those wages in the calculation of Social Security benefits later in life.

Czech acknowledged that BVU did attempt to report personal usage of vehicles on 2012 W-2s, but the valuation was incorrect, so the amount included was not as high as it should have been. There is an IRS publication indicating that achievement awards up to a $400 value are not taxable income, but there is another publication specifically addressing government entities, and it provides that any cash award, no matter the value, is always included in an employee's taxable income. Regarding de minimis fringe benefits, Czech testified that the IRS considers a non-cash benefit to be of de minimis value if its value is no more than $100. That information is publicly available on the internet.

David Copeland, former Vice President of Operations at BVU, pleaded guilty to conspiracy to commit wire fraud and money laundering pursuant to a plea agreement and is currently incarcerated. The charge was related to his dealings with Edwards Telecommunications, Inc. ("ETI") while he was employed by BVU.

Copeland testified that he was asked to solicit BVU event sponsorships from ETI and to request that ETI pay for a scoreboard at TCCS. Other vendors were also asked to provide things to BVU, including payment for a customer appreciation event. Copeland also asked Todd Edwards of ETI to participate in a fraudulent scheme to benefit Copeland personally, but others at BVU were

unaware of the scheme at the time. Copeland and Jim Kelly, a former BVU executive who used to be Copeland's boss, both separately asked ETI to provide them other things, such as hunting trips and use of a backhoe; other BVU executives were unaware of these personal demands.

On October 18, 2008, Rosenbalm, who was then serving as president of the Bristol Chamber of Commerce ("Chamber"), sent an email to Pomrenke, Hollifield, Griswold, Blevins, Copeland, and a number of other BVU employees, flagged as high importance. The email read:

> Everyone,
>
> The Chamber is having a membership drive starting this Monday. We need to make a big splash for them to help with our community relations and the perception of BVU. With that in mind I have listed below who I want to contact each group that does work for us. These people/organizations make allot of money off of BVU and they need to return the favor by helping us with this. I strongly suggest that each one join to help the Chamber which in turn helps BVU more than you can imagine within the business community. The cost to join is $295 per year and that includes two employees. It is $12 per employee for every employee above two. So if a company has only two employees it is $295 per year. If they have 10 it is $295 plus (8*12). If they really want to help they can do a Gold Club membership which is simply the calculation above based on employee and then 3 times the value. So if they only had two employees it would be (3*295.)
>
> Below is a list of who needs to contact each group. If I have forgotten anyone or company please add them to this list. If a company regularly does business with BVU they need to join.
>
> Stacey              Richard Linnen
> John                Billy and Mark

| | |
|---|---|
| Mark F | Slick and Rad |
| Brian | CSA and Sunguard |
| Kyle | whoever it is we buy all the footballs etc… from |
| Brad | Jerry Miller, Vestal and Dynamark |
| Dale | Who did I forget to add to this (electric supplier whose name escapes me at the moment and Graybar) |
| Craig | Whomever we get our parts and gas from including tires |
| Buddy | GDS |
| Linda | Sesco |
| Copeland | ETI |

Several like Alcatel and Mattern & Craig have already joined.

If you think of people I don't have on this list please email them to me.  Please get this done on or before Wednesday so the Chamber can use it for its membership drive totals.

What I need from each company is:
Number of employees
Name and address to send the bill to
Gold club or not

It goes without saying but I am going to say it we have been good to these companies they need to return the favor to us and it will cost very little money to do so.  This will help us within the business community.

(Gov't Ex. 1, ECF No. 119-7.)  Billy and Mark were contractors who did work for BVU's water department.  Slick and Rad were contractors who did wiring work for BVU.  CSA and Sunguard do billing-related work for BVU.  Jerry Miller did custodial work.  Vestal did mowing work for BVU, and Dynamark performed security functions.  Graybar is a large wholesale supplier of electrical supplies that provides products to BVU.  Sesco performed human resources work for BVU.

62

Copeland asked ETI to join the Chamber, and he thinks they joined, but he is not certain.

Rosenbalm chose ETI to fund the BVU Christmas party in 2012 because it had done work for BVU for a long time and was one of BVU's biggest construction vendors. Pomrenke was involved in the discussion of who would be asked to fund BVU parties that year. Copeland asked ETI to fund the Christmas party, and ETI did so. The party included dinner, entertainment, and door prizes. The owner and president of ETI was Todd Edwards, and his brother Brian Edwards was the vice president of ETI. Copeland talked to Todd and Brian Edwards about funding the party. BVU also asked ETI to pay for alcohol at a customer appreciation function. Copeland did not make that request. ETI agreed to pay for the alcohol, which cost at least $5,000.

As part of its marketing efforts, ETI gave gift cards to Kelly, Rosenbalm, Pomrenke, and Copeland as Christmas gifts. Copeland usually received a Lowes or Bass Pro Shop gift card. In approximately 2012 or 2013, Pomrenke called Copeland into her office and asked him to contact ETI and request that they give her a gift certificate to the spa at the Martha Washington Inn rather than a gift card like she had received in previous years. Copeland went to Brian Edwards's office on the BVU premises and made the request. Brian Edwards responded that he would have to speak to his brother, but they would see what they could do.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 63 of 140   Pageid#: 5643

When ETI sent BVU invoices, Copeland signed the invoices and then took them to Pomrenke so that she could approve and sign them. If she did not sign an invoice, ETI would not get paid.

BVU received, and ETI was paid from, federal and state grant money. ETI had contractor crews who did cable and telephone installations. Copeland thought that if ETI had refused to pay for the Christmas party, its future bids would have been more closely scrutinized, and it probably would have lost some work.

Copeland was responsible for inspecting contractors' work and then authorizing payment of invoices. Pomrenke had no way of knowing whether the work had been done correctly and relied on Copeland's recommendation. Copeland reviewed proposals with Kelly and recommended who should get the contract; Pomrenke was not involved in deciding who won the bid on construction projects. Pomrenke did ask Copeland questions about invoices. She had no way of knowing that Copeland and ETI were falsifying invoices.

On September 25, 2013, Pomrenke sent an email to Bundy and Copeland stating, "I thought we had BVU staff running CPC trouble now – why are we paying ETI over $1k? Was this for a fiber break, etc? The ETI invoices need to be more descriptive such as date of work performed and event requiring trouble call. Can they please do that?" (Def. Ex. 39, ECF No. 119-6.) Bundy forwarded Pomrenke's email to Brian Edwards and asked him, "What was this work for?"

64

(*Id.*) In his response, Edwards wrote, "I can't tell you what caused the trouble that would have to come from a BVU Supervisor. BVU Supervisors tell the installers when and where to do the work." (*Id.*) Copeland supervised the supervisors. Copeland agreed that he was the person controlling millions of dollars that were paid to ETI.

On November 9, 2011, Rosenbalm emailed Copeland regarding ETI, asking "Did they agree to do the Christmas party?" (Def. Ex. 38, ECF No. 119-5.) Copeland replied, "That week you asked me to call him, I did but he was out of town so I never talked to him. I will still ask or do you want to just do a cash bar? Just worry about the liability of it." (*Id.*) Rosenbalm responded, "Ask them." (*Id.*) Copeland testified that Rosenbalm, rather than Pomrenke, directed Copeland to request funding from ETI. However, the next year, on November 6, 2012, Pomrenke sent an email to several BVU employees in which she stated that she wanted ETI to pay $15,000 for a Christmas dinner, and she directed Bundy and Copeland to contact ETI.

Brian Edwards and his company, ETI, began working with BVU in 2000 when BVU was building a system to connect fiber optic cable directly to consumers' homes. In 2012 and 2013, Brian Edwards held the title of Executive Vice President over outside operations at ETI. ETI was owned by his brother, Todd, and was based in Columbia, South Carolina.

65

ETI initially began working for BVU as a subcontractor. BVU notified ETI that it had issued an RFP for a project spanning from Lebanon, Virginia, to Abingdon, Virginia. ETI submitted a bid and was awarded the project. Typically, BVU would advertise an RFP and host a preconstruction meeting to discuss the scope of the project. Interested contractors would submit bids, and the contract would usually be awarded to the lowest bidder. All of the contracts that ETI won with BVU were funded through state or federal grants.

BVU was a very important client of ETI, comprising approximately 30% of ETI's work. Losing the BVU contracts would have jeopardized ETI financially. At one time, ETI employed 16 or 17 installers who were working for BVU, in addition to construction workers, all of whom had families to feed. Brian Edwards moved to the Bristol, Virginia, area in 2009 to work on-site at BVU.

Brian Edwards at some point became aware of an illegal agreement between his brother Todd and Copeland. At Copeland's request, Todd asked Brian to falsify a $144,000 invoice. When asked why he did so, Brian testified, "We both felt like we had to. We felt like if we didn't, Mr. Copeland was going to find a way to get rid of us." (Trial Tr. 189, Feb. 23, 2016, ECF No. 164.) Brian also learned that Kelly was requesting false invoices as well, and Brian created some of those fraudulent invoices. Todd ultimately pleaded guilty to a felony charge

pursuant to a plea agreement, which expressly ensured that Brian and other ETI employees would not be prosecuted for their conduct involving BVU.

BVU asked ETI to sponsor two golf tournaments for BVU employees, guests, and vendors. The tournaments were not charity fundraisers.

ETI gave gift cards to its customers at Christmas to show its appreciation for their business. The people chosen to receive the gift cards were the people who entered into contracts and directed business to ETI. At BVU, ETI gave cards to senior management and vice presidents. Originally, the cards were typically for restaurants. In 2010, Copeland approached Brian Edwards and said that Pomrenke wanted a spa gift card instead. From his truck in Abingdon, Virginia, Brian called ETI's Columbia, South Carolina office and relayed the request to Buddy Timmons, who worked in marketing and development for ETI. Timmons obtained a spa gift certificate for Pomrenke. Brian was not happy with Pomrenke's request, but he complied with it because he believed that she controlled the business relationship and flow of money between ETI and BVU, as her name was at the bottom of every invoice. If she did not sign an invoice, ETI would not get paid for the work performed.

The following year, Copeland called Brian and said that Pomrenke wanted a Belk gift card instead of a spa gift certificate. Brian was again irritated by the

request, but he passed it along to Timmons, who complied. The next year, Pomrenke requested another spa gift certificate.

BVU asked ETI to pay for alcohol at a BVU employee Christmas party. ETI complied with the request. ETI was not invited to attend the party. The next year, Copeland approached Brian and asked to take a ride in Brian's truck. While they drove, Copeland told him that Bundy had determined which vendors had received the most money from BVU over the years, and BVU was going to ask those vendors to sponsor the employee Christmas party because BVU did not have enough money to pay for it. Brian asked how much BVU was requesting from ETI, and Copeland told him $15,000. Brian asked if Copeland was kidding, and Copeland said, "No, that's what we need so that we can provide some bonuses and gifts for some BVU employees." (Trial Tr. 198, Feb. 23, 2016, ECF No. 164.) Brian said, "Now, Bundy is new. What does Wes and Stacey think about this?" (*Id.*) Copeland replied, "No, they're all three agreeing this is what they wanted to do." (*Id.*) Brian said it was not his decision and he would have to ask Todd. When he told Todd the request, Todd was not happy about it. Brian, Todd, and Timmons discussed the request the next day and ended up paying the $15,000. They were not invited to attend the party. They paid because it was their "opinion if we didn't that it would rub them the wrong way, and we would, we would be without a job." (*Id.* at 199.)

Case 1:15-cr-00033-JPJ-PMS Document 219 Filed 08/01/16 Page 68 of 140 Pageid#: 5648

Brian had very little direct contact with Pomrenke. The illegal scheme involving Kelly took place from 2008 to 2009, and the illegal scheme involving Copeland took place from 2009 or 2010 until 2012 or 2013. Brian and Todd tried to keep these payoffs secret.

In his testimony, Todd explained that ETI had performed aerial and underground installation work for cable television, telephone, and other fiber optic providers, and also had done commercial and residential wiring.

ETI did all of the original underground construction work for BVU OptiNet as a subcontractor for Atlantic Engineering Group ("AEG"). AEG then assigned ETI the installation and drop service work for residential and commercial BVU customers. ETI's installation contract with BVU was not funded by a federal grant. BVU terminated its relationship with AEG in 2003 or 2004, and ETI submitted and won bids for maintenance work, any additional infrastructure work, and installation and drop-service work. The initial contracts had two-year terms, and they went up for bid several times. In 2009 or 2010, the installation and maintenance contracts were extended without competitive bidding. Todd testified that this was not unusual because the third time the contracts were up for bidding, ETI was the only bidder. After the government investigation and Todd's guilty plea, BVU solicited bids for the fiber slicing work, and ETI's subcontractor won the bid. BVU also solicited bids for the installation work, and ETI was the low

69

bidder, but BVU refused the bid due to a conflict of interest and instead performed the work internally.

Todd testified that 35% of ETI's revenue came from BVU. There were times when ETI was only performing day-to-day work for BVU, but the last two projects it did were significant. One was funded by a federal grant, and ETI was the main contractor on the project. BVU paid ETI about $18,000,000 out of the federal grant money. Todd testified that the industry standard for net profit after depreciation and expenses is about 3.5%, but ETI's profit was much higher, around 10-12%. Todd stated that "BVU contributed a lot to ETI's success." (Trial Tr. 18, Feb. 24, 2016, ECF No. 165.) BVU was also an important customer because ETI made a huge investment in order to do the work, and it hired people locally as well as hiring people to move to the Bristol area. For those reasons, ETI wanted to keep BVU's business.

Todd thought that BVU's practice of asking ETI for things of value was outside of the norm. He was not used to being asked or expected to give things to customers. Kelly called Todd into his office at one point and directly told him, "I need you to compensate me if you want to continue to work here." (Trial Tr. 20, Feb. 24, 2016, ECF No. 165.) Todd paid Kelly $165,000 over a three-year period. After Kelly left BVU, three or four weeks into the next project, Copeland approached Todd about a fraudulent billing scheme. Todd understood that if he

participated in the scheme, he would likely win the upcoming bid, but if he did not participate, he would probably lose the work. The plan was to pad the invoices with extra charges for removal of rock. Todd complied with Copeland's request and over time, ETI billed BVU an extra $144,000. When BVU paid the bills, Todd paid the fraudulently obtained money to Copeland.

Copeland told Todd that Pomrenke and Rosenbalm would have to approve the bids before contracts were awarded. Pomrenke signed off on each invoice. That influenced how Todd responded to requests from BVU or Copeland.

Regarding the gift cards ETI gave Pomrenke, Todd testified that ETI did not give spa gift certificates to anyone else. One of the spa certificates cost ETI $200 and one cost $250. ETI purchased the first spa gift card on December 19, 2008, and the second in December 2010. On January 14, 2010, Pomrenke emailed Todd to thank him for the gift cards. Todd replied, saying, "You are welcome. Thanks for all the opportunities you have given our company. I hope we get the opportunity to meet in person sometime." (Gov't Ex. 142, ECF No. 126-4.) The government introduced a list of Christmas gifts that ETI was planning to send to its customers as of December 10, 2012. The list indicated that Rosenbalm would receive a $250 gift card to Bass Pro Shops, Pomrenke would receive a $200 gift card to the Martha Washington Inn, and Copeland and Bundy would each receive $200 gift cards to Bass Pro Shops. The greatest gift card denomination to be

received by any other customer representative was $150, with many receiving only $100 or $50 gift cards. Timmons emailed the list to Brian and Todd in the middle of the large project from which ETI would receive $18,000,000 in federal grant money. The next year, in 2013, Copeland and Bundy each received $100 gift cards to Home Depot, and Dale Blevins received a $50 gift card to Home Depot. Pomrenke received a $100 gift card to Belk. That year, all of the customer representatives receiving gift cards from ETI received either $100 or $50 denominations.

Copeland asked Todd to provide him hunting trips. Todd did not tell anyone other than Brian about the trips. Copeland also borrowed a backhoe from ETI and later told Todd he wanted to keep the backhoe. Copeland told Todd he had to join the Bristol Chamber of Commerce and the Fiber to the Home Council, one of whose officers was a BVU vice president. Rosenbalm asked ETI to donate a sign to TCCS. BVU asked ETI to sponsor two golf tournaments, providing the green fees, prizes, and food. The tournaments were not charity events. Rosenbalm did not want to use BVU funds to pay for alcohol at a BVU Christmas party, but employees would not want to attend if no alcohol were served, so Copeland asked ETI to pay for the alcohol and ETI agreed to do so. The next year, BVU did not have enough money both to give employees raises and to throw a Christmas party, so Todd was told that ETI would have to pay for a portion of the Christmas party.

When asked how much money ETI would have to contribute, the response was $10,000 to $12,000. Todd thought other vendors were also asked to pay, and he expected that if ETI did not pay, its business relationship with BVU would suffer. He was aggravated by all these requests, but he complied anyway.

On January 3, 3012, Pomrenke sent an email to Copeland that stated in part, "David, can you please forward this to Todd at ETI? This is the total cost of the BVU Employee Christmas party that was held on December 15th. . . . I would prefer them to make direct payment to the Foundation Event Facility. . . ." (Gov't Ex. 75, ECF No. 126-9.) Copeland forwarded the email to Timmons, who then forwarded it to Todd. Brian Edwards told Todd that ETI was chosen to sponsor the event because ETI was BVU's largest vendor in terms of the amount of business it was doing for BVU. The total amount ETI paid for the party was $12,297.18.

Todd was asked at trial to "[e]xplain to the jury why you felt if you didn't pay for those gift cards for Mrs. Pomrenke, or you didn't pay for the Christmas party, why your business might suffer." (Trial Tr. 43, Feb. 24, 2016, ECF No. 165.) Todd responded:

> First of all, when somebody says if you do this I'll try to get you as much work as possible, or keep you here working, what's the alternative to that? If you don't do it, you won't work here, and Jim Kelly made that comment, Dave Copeland made that comment, but BVU had hired my employees on numerous occasions, they hired the vice president of my company to go run another sister company that

73

they had in Mooresville, South Carolina. They hired my supervisors, and it was just like, they treated us however they wanted to. They expect me to have the staff there to do the work, but then when they said it might be cheaper for them to do it internally, instead of going and getting their own people they just go and hire mine. So I'm sitting here with all these trucks and this equipment to do this work, I felt like I had to. We feel like we can do it cheaper, and they just hire my people again. This happened more than once. So, I felt threatened.

(*Id.* at 43-44.) Some of the requests for proposals issued by BVU stated that BVU did not have to accept the lowest bid.

Todd testified that Pomrenke did not inspect construction work and had no way to know that ETI was falsifying invoices. Todd's other clients did not request gifts; they did not even let him take them to lunch if it had anything to do with receiving federal funds.

The government introduced a lengthy email exchange between Pomrenke and Rosenbalm sent on December 14, 2006. In her initial email to Rosenbalm, Pomrenke wrote, "I am the one that is ALWAYS here, I am the one that keeps this place running on most days when you are in and out." (Gov't Ex. 155, ECF No. 126-11.) She further wrote, "I feel that I am the one that help makes a big percent of things happen . . . . I am the one . . . taking care of 90% of the day-to-day operating issues." (*Id.*) In addition, she wrote, "I feel that the two of us are a great team and we make sure BVU is a success." (*Id.*)

In his response, Rosenbalm wrote, "I do things for you I would never do for anyone else. . . . I bought the Tahoe which was not smart on my part (PR or politically wise) and will come back and bite me at some point." (*Id.*) In her reply, Pomrenke wrote, "As for the Tahoe, if I could have personally came out whole on a trade/sell of the Tahoe, I would have. I do not flaunt, at all, the fact that I have a company car and once again, I am sorry for putting you in that position." (*Id.*) She also wrote, "I will always have your back — Like I said, we make a really good team." (*Id.*)

On July 13, 2007, Pomrenke sent an email to Leslie Buchanan requesting $500 in cash "to pay a bonus to an employee." (Gov't Ex. 47, ECF No. 126-12.)

On December 17, 2007, Pomrenke emailed Rosenbalm and wrote, "will I receive any more perks with a contract, just curious." (Gov't Ex. 130, ECF No. 126-13.) Rosenbalm responded, "What perks do you want?" (*Id.*) Stacey then wrote, "would it be too much to ask for a club membership at The Club? I have lots of friends that go there with their kids, etc. Just asking……" (*Id.*) Rosenbalm replied, "No I don't think that is an issue but you know you can use mine now? What do the do with their kids at the Club?" (*Id.* 5.) Pomrenke wrote back, "yes, but I am always asked my name and I have to use yours – looks like I am trying to pull something . . . . swimming, golf lessons, tennis lessons, Halloween parties, Easter egg hunts, etc…." (*Id.*) In response, Rosenbalm wrote, "I will get it added

to your contract assuming it does not cause any grief." (*Id.*) In later emails, the two discussed the Country Club's new fitness facility. (*Id.*)

On April 29, 2008, Pomrenke emailed Dale Blevins asking if he could "have the warehouse guys bring 8 tables to my house on Thursday" for a yard sale. (Gov't Ex. 162, ECF No. 126-14.) She also requested a clothes rack.

On June 1, 2009, Rosenbalm sent an email to Pomrenke, Hollifield, Boothe, Childress, Munsey, and Christopher Hall that stated, "Alcatel is coming in today and I need to hit them up with the sponsorship requests we discussed. I recall the kids Christmas part but what else do we need sponsors for?" (Gov't Ex. 18, ECF No. 126-15.) Approximately two weeks later, Pomrenke emailed Rosenbalm, stating that Steve Price from Alcatel could "commit $3k" and "would like to do the $2k Intelligent Community project." (Gov't Ex. 5, ECF No. 126-16.) The email explained, "he said if we could add $1k to that and make it a big event, that would be great or we could take the $1k and apply to another company function." (*Id.*) Pomrenke remarked, "I was pretty disappointed at only the $3k!" (*Id.*)

On August 14, 2009, Rosenbalm sent an email to Pomrenke, Childress, and others stating, "Level 3 has agreed to give us $3k for the ICF/10k event as well. . . . Gail at this point you should have enough money to cover this event as well as the kids Christmas party." (Gov't Ex. 12 at 2, ECF No. 126-17.) After some discussion about accounting for the payment, which came in the form of a

statement credit, Rosenbalm wrote, "Mark has to reconfirm that the value is $3k and I am all confused that anything was easy with accounting. Don't we have to call Washington and ask for the GAP rules to be changed? I thought Moses brought those rules down with the 10 Commandments?" (*Id.* at 1.) Pomrenke replied, "It is GAAP and yes, they were handed down by Moses!! We really are good guys – we just keep everyone out of trouble!!!" (*Id.*)

On September 10, 2012, Rosenbalm sent an email to Boothe, copying Pomrenke, that stated, "I have the gift cards Stacey wanted as well as the $25 cards for a year's worth of birthdays. They are in the gray bags on my desk, please get these and store in the safe for me." (Gov't Ex. 44 at 2, ECF No. 126-18.) Boothe acknowledged that he had received the cards and indicated that Donna would place them in a fire-proof filing cabinet. Shortly thereafter, Pomrenke wrote, "That is right – 163 cards for birthdays. And then $2500 for upcoming Christmas parties, etc. You have them all☺." (*Id.* at 1.) Rosenbalm then forwarded the email to lizr@bvunet.net, asking, "Is this correct I thought you told me 170 cards." (*Id.*)

On June 17, 2010, Pomrenke wrote to Blevins, "is there any way you could take a BVU truck to my house and take the old blue pool cover I have down at the pool and throw it away for me in a BVU dumpster outside?" (Gov't Ex. 167, ECF No. 126-19.) On August 10, 2010, Pomrenke sent an email to pomrenke@bvunet.net (likely directed to her husband), that stated,

two summer guys that work here are coming to the house tomorrow to work on the grass / felt / stones at the pool and to also pressure wash and stain the swing set.
Will we have time this evening to run and get the supplies?

I LOVE YOU!
Stacey

(Gov't Ex. 166, ECF No. 126-20.)

On September 27, 2010, Pomrenke sent Blevins the following email:

Can you do some things for me?  I have to fly out around 2 this afternoon and will not be back until thursday.
1.      In the back of m car are clothes on hangers – will you please take them to salvation army for me and get a tax slip?
2.      There are marked boxes in the back.  Will you please bring those to my office and then have one of the intern workers shred for me today or tomorrow?

Thank you so much!

Also the tables and chairs are stacked in my garage!  Thanks for helping me!!!!

(Gov't Ex. 163, ECF No. 126-21.)

On November 10, 2011, Rosenbalm sent an email to Childress and Brian Ritz, copying Pomrenke and Copeland, stating, "We have a sponsor for the bar at the customer appreciation function. Please have them send that bill to ETI, not BVU." (Gov't Ex. 74, ECF No. 126-22.)  Pomrenke asked, "Where are we having this?," to which Rosenbalm replied, "House on Main and Barter." (*Id.*)

On November 11, 2010, Pomrenke emailed her husband and asked, "What time can you be at BVU to meet Dale to take the tables to the Train Station?"

(Gov't Ex. 164, ECF No. 126-23.) Pomrenke's husband replied, "How about 3:00 to be safe?," and Pomrenke then forwarded the email to Blevins, asking, "Will 3 pm tomorrow work for you to take the tables to the Train Station?" (*Id.*) Blevins replied, "I can make that work," and later wrote, "Just have Kurt meet me at the Train Station at 3:15 I can get help to load them at BVU." (*Id.*)

On September 23, 2010, Pomrenke wrote to Blevins, "Can you have 4 tables and 25 chairs delivered to my garage today? I am having a wedding shower for a good friend of mine Friday evening. THANK YOU!!!!!!" (Gov't Ex. 165, ECF No. 126-24.)

On June 26, 2012, BVU board member Archie Hubbard sent an email to BVU board member Doug Fleenor that stated, in relevant part:

> Wes said that he has been working on a revised car use policy since we last spoke about this a couple of months ago. Basically, the policy will be amended to state that no one but upper management and folks "On Call" will be able to take a company car home for the evening. There are other changes being looked at as well. I will make sure personal use gas is not included for anything under the revised policy (I don't think it ever was included but I will be sure it isn't henceforth).
>
> Walt and Stacey are the only Country Club memberships at present. It covers dues but no usage frees. They took reduction in pay to cover the expense of club membership. This saves them Taxes and it saves BVU FICA Taxes and more importantly VRS match for those two should be less as a result of less Gross Pay. This actually saves BVU money. Don't we want to do that everyplace we can? We had it in his first couple of contracts with us, but he stopped it several years ago to avoid the wrong impression. He pays for his out of his pocket. It will cost us more money to have them pay for theirs.

79

(Gov't Ex. 154, ECF No. 126-25.) Hubbard then forwarded the email to Rosenbalm, writing, "This is what I sent to Doug…Don't tell him I sent copy to you." (*Id.*)

On August 14, 2012, Pomrenke wrote to Ervin, "there will be four of us from BVU attending the Oct 6th opening Saturday at Keeneland. Any Viamedia suite perks for us? We are excited!!!" (Gov't Ex. 128, ECF No. 126-26.)

By email dated September 18, 2012, Pomrenke again requested $500 in cash to pay an employee an equipment recovery bonus.

In an email sent to Pomrenke and others on November 14, 2012, Keith Simms of Alcatel Lucent confirmed that Alcatel Lucent would pay for BVU's children's Christmas party. Pomrenke forwarded the email to Rosenbalm, stating "Alcatel is covering the Children's Christmas party☺." (Gov't Ex. 48, ECF No. 126-28.)

On November 7, 2012, regarding underwriting of holiday employee events, Lane emailed Pomrenke and others with the following information:

> I received confirmation from Robert Murrie @ ETI for $2,850 toward the Thanksgiving lunch. He needs an invoice for that amount to pay toward.
>
> I talked to Keith Simms @ ALU and he agreed to run the request for $5,800 up the pole, but says ALU is in a freeze on cash expenditures do to poor financials. So, in the interest of having a backup system, I sent the same request to Michael Brady @ Level3 (who was not in the office), and expect to hear back tomorrow. I have a third potential source if both of these fall through.

80

(Gov't Ex. 33 at 2, ECF No. 126-29.) On January 22, 2013, Lane forwarded that email to Pomrenke, stating, "FYI, here is the e-mail I sent about ETI's donation. I did not copy Accounting on it, so unless you sent it to them, ETI has not been invoiced. I'll get with Debbie and ask her to generate an invoice for it." (*Id.*) Pomrenke responded, "Perfect. Can you give me Robert's email address and I will take care of it. THANKS!" (*Id.* at 1.) Lane responded with the email address and also wrote, "I sent Debbie the dollar amount after I replied to you. Let me know if I can help further." (*Id.*) He then replied again to state, "FYI. This is ETI Software, not Edwards Telecom :)." (*Id.*)

Faith Esposito was a BVU Board of Directors member for approximately 10 years. She was chair of the board from July 2012 until July 2014. She testified that the board only dealt directly with Rosenbalm and Bressler, meaning those were the only people the board could hire, fire, and supervise. According to Esposito, the board could only inquire of other employees for informational purposes. The only employment contracts that were approved by the board were those of Rosenbalm and Bressler. Pomrenke reported to Rosenbalm.

At a board meeting on February 19, 2009, it reviewed and approved the BVU Code of Business Conduct and Ethics Policy. The minutes indicate, "Mr. Rosenbalm explained that BVU has not had an incident that prompted the development of this Policy, but that he felt this was a Policy necessary to the

organization." (Def. Ex. 50, ECF No. 126-32.) The Gifts and Entertainment portion of the policy reads:

> Neither you nor any person with whom you have a close personal relationship may accept gifts or anything of value (including entertainment and loans) from a vendor (existing or potential), supplier, or customer if that gift or other thing of value is, or that a reasonable person could consider to be, intended to influence your behavior toward that vendor or customer. Absence such circumstances, gifts may be accepted when permitted by applicable law if they are non-cash gifts of nominal value ($500.00 or less, individually or taken together) or customary and reasonable meals and entertainment at which the giver is present, such as an occasional business meal or sporting event. You shall not accept travel or lodging unless previously approved by the President.
>
> If you are offered money or a gift not in conformity with the exceptions noted above, or if such arrives at your either office or home, or you receive a gift that you may accept pursuant to this Code, you must report it to your supervisor in writing with a copy to General Counsel.

(Def. Ex. 51 at 7, ECF No. 126-31.) Pomrenke was present at the board meeting when the policy was discussed and approved.

On September 22, 2011, Rosenbalm sent an email to all of the board members and copied Pomrenke and Lane. The email read:

> We are very close to moving forward with Alcatel and Microsoft for the IPTV solution. We have asked that part of the consideration, post award, on this project be a site visit in Dallas for the Board and key staff to view the product. We are looking at leaving on November 5th and returning on November 8th. We would fly out mid day on Saturday the 5th then attend a Cowboys game on Sunday do the site visit on Monday and then return home Tuesday morning. Please let me know if you would like to make this trip. The following have already confirmed:

Doug

Jim Rector

Jim Steele

Paul Hurley

Alcatel will have to confirm the trip so I need to get a head count as
quickly as I can. If you can please respond to me as quickly as you
can so they can plan and let us know if these dates and numbers work.

(Gov't Ex. 169, ECF No. 126-33.) Esposito did not see any reason for board

members to travel to Alcatel in Dallas, and she thought it was wrong for Alcatel to

pay for BVU board members and employees to go to Dallas and attend a football

game. She did not go because "I didn't feel it was necessary to my membership on

that Board." (Trial Tr. 167, Feb. 24, 2016, ECF No. 165.) Esposito did not believe

Pomrenke went on the trip to Dallas.

Kenneth Grelck was employed by Calix, an equipment provider to telephone

companies, from April 2009 until April 2013. His position was vice president of

sales for the eastern communications companies. Calix sold broadband equipment

to communications companies for use by business and residential customers. Calix

was a BVU vendor, and BVU was within Grelck's sales territory. His primary

contact was Evans, who worked for Lane in the engineering division, and he

worked with Lane as well.

In 2009, Lane emailed Grelck and asked Calix to sponsor an employee

appreciation luncheon. Lane did not request a specific amount, but Calix provided

83

$1,000. Grelck did not feel obligated to give the money. He did not believe that he or Calix would suffer any economic loss if he did not give BVU the money. He did not intend to influence anyone by contributing the funds. Calix commonly sponsored events as part of its marketing campaign to develop brand awareness and good will. At the time the money was requested and paid, Calix was not actively competing for a contract with BVU; it was already working under a contract with BVU. At some point, however, the contract would have to be re-bid. According to Grelck, "It was to show that we were supportive of BVU. It wasn't to, to trade for a contract; it was to show that our brand and our company was supportive of BVU and their employees." (Trial Tr. 175, Feb. 24, 2016, ECF No. 165.)

Alcatel was a competitor of Calix. On July 27, 2009, Grelck sent an email to John Colvin, Vice President of Sales at Calix, regarding "requests for sponsorships from customers." (Gov't Ex. 45, ECF No. 126-34.) Grelck indicated that BVU was "recognized as a finalist in Intelligent Community Forum for their network, and are having a celebration luncheon. Mark Lane – CTO – has asked us to support the luncheon. I have found out ALU is putting $3K forward for the lunch. I think Calix should put in $1K." (*Id.*) Grelck testified, "What others are doing helped me justify inside that this was the right thing to do as we go forward. Part of what we got with this luncheon was there was a sign with the brand on the

84

sign, as well." (Trial Tr. 177, Feb. 24, 2016, ECF No. 165.) Grelck testified that Calix and Alcatel were awarded different footprints in their business with BVU, and "the ongoing growth that we would see would be resulting from BVU's success, not necessarily competing on every house that they're putting equipment in." (*Id.*)

Wesley Dale Blevins worked at BVU from 2003 until 2014, when he retired. He was the warehouse manager, inventory manager, placed purchase orders, and dealt with automobiles. On July 7, 2006, he wrote the following memorandum to "Purchase File, FY 2007 Budget" regarding "Purchase of Company Vehicle for Executive Vice President":

> Per the FY 2007 a vehicle was to be purchased for BVU's Executive Vice President, Stacey Bright. Upon analysis of Ms. Bright's current car payoff and the purchase price of a new GMC Envoy, it was concluded that it was in the best interest of BVU to assume the ownership of her current vehicle to serve as her BVU Company vehicle. The payoff of Ms. Bright's vehicle was $31,000. The quote received from Goodpasture Motors for a 2006 GMC Envoy was $33,545 and the sticker for an "on the lot" 2005 SLE 4x4 GMC Envoy was $33,350. With this analysis, the purchase of Ms. Bright's existing vehicle was made. It has been determined that there is no other source for a used vehicle of this type and condition at this price, and this is therefore a sole source purchase.

(Def. Ex. 52, ECF No. 126-35.) Blevins did not know whether the information in the memorandum was true. He was given the information by the fleet manager, Craig Blevins, who is now deceased.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 85 of 140   Pageid#: 5665

Blevins routinely performed personal tasks for Pomrenke on BVU time with a BVU vehicle. He considers Pomrenke to be a close friend. Pomrenke often worked through lunch and worked long hours.

Lane, the Chief Technology Officer at BVU, had been employed by BVU since 2002. Pomrenke was his immediate supervisor. He explained that OptiNet was a business that competes for customers with other broadband providers, while the electric, water, and waste water services provided by BVU are provided to rate payers without competition from other providers. Lane testified that OptiNet was profitable and that "OptiNet is where it is today because of [Pomrenke's] financial acumen." (Trial Tr. 5, Feb. 25, 2016, ECF No. 166.)

In her job, Pomrenke oversaw all the budgets, product service development, and regulatory affairs. Lane testified that she had a strong work ethic and passion for the business, she worked long hours, and she did whatever was needed to keep the business running. He testified that many employees at BVU work through lunch, and that benefits BVU because they get more work done.

Comcast is a competitor of BVU. To monitor what Comcast is offering its customers, BVU has Comcast service at an employee's house. Aside from Pomrenke, other employees have also had competitors' services at their homes.

Lane was asked to contact some vendors to solicit funding for a lunch to celebrate BVU being named as a finalist for an Intelligent Communities award.

That was the first time he asked vendors to give anything of value to BVU. Over the years, he made requests of Calix, Infinera Networks, Level3, and CHR Company. Lane was asked to contact those vendors because he worked with them on a daily basis. He never told them they were required to contribute anything, and he never threatened any loss of BVU's business if they did not contribute. He considered his approach to be a gracious one. Lane is unaware of any BVU vendor who suffered economic loss or did not continue to do business with BVU because it did not contribute when requested. Lane asked Level3 to contribute to an event in 2012, and Level3 declined, and there were no consequences for Level3. Lane did not think there was anything illegal or improper about asking vendors to contribute to events. Legal counsel was aware of the practice.

On November 22, 2011, Pomrenke sent the following email to Lane, Hollifield, and Blevins:

> We received two bids yesterday in response to our Ad Insertion RFP. They were from:
>
> 1.    ViaMedia
>
> 2.    Prime Media
>
> Dale is bringing you copies of the RFP responses.  **We are to award the response on Friday, 12/2.**
>
> **Can I ask that the two of you meet the week after Thanksgiving and review the awards and make a recommendation to me, in writing, based on the RFP requirements, as to who we should award the bid to?**

Dale, I also have another piece of PrimeMedia literature for you to give to Mark and Kyle.

THANK YOU,

Stacey

(Def. Ex. 53 at 2, ECF No. 128-1.)  Lane responded with December 1, 2011, with his analysis of the advantages and disadvantages of each proposal and a recommendation to award the contract to ViaMedia after negotiating several points.  General Counsel Bressler reviewed this contract and all other contracts before BVU entered into it.

Lane explained that BVU had become involved with MI Connection when it bid on and won a contract with Mecklenberg County, North Carolina, to operate a cable television system that the county had purchased.  BVU provided technical engineering expertise, help desk staff, and field personnel.  Pomrenke took the lead on the project and traveled to North Carolina often between 2006 and 2010.  Early in that period, she traveled there weekly and spent several days at a time there.

Like Pomrenke, Lane used his company vehicle for personal purposes, and he did not pay taxes on that personal use, nor did he pay taxes on the pre-paid debit cards he received, until BVU issued amended W-2s for certain years.  Lane also benefitted from tickets provided by vendors, and he took a trip to Dallas that was funded by Alcatel shortly after BVU entered into a significant contract with Alcatel.   Lane agreed that Pomrenke set a bad example for employees by asking

88

BVU personnel to do personal tasks for her on BVU time. Lane agreed that it would not be right to have BVU pay for his meals when he works through lunch.

On July 23, 2009, Lane sent an email to John Reid of Level3, copying Rosenbalm and Pomrenke, requesting that Level3 help to fund the Intelligent Community luncheon for BVU employees. Eight days prior to sending that email, Lane had sent another email to Reid conveying his dissatisfaction with Level3's pricing. BVU continued to do business with Level3 even though it could have gotten a better price from another provider.

The RFP to which ViaMedia and Prime Media responded in 2012 contained a Vendor Ethics Policy that stated, "gifts or kickbacks shall never be solicited or accepted." (Gov't Ex. 35 at 13, ECF No. 128-13.) Lane agreed that if Pomrenke was requesting and receiving tickets to sporting events during the proposal process, that would violate the policy. Lane testified that BVU had decided before receiving proposals that ViaMedia was the only acceptable vendor for what BVU wanted.

Griswold was later called to testify by the defendant. He testified that in 2012, he had received five tickets to a Dallas Cowboys football game in Charlotte, North Carolina. Griswold requested and used those tickets, though Pomrenke was the one who contacted ViaMedia to ask for them.

89

On August 9, 2010, Pomrenke emailed Griswold to ask, "Do you think that two of our summer help guys would like to work one day at my house this wk for about 10 hrs and I would pay them? I have a couple of small projects I need done by Thursday." (Def. Ex. 54, ECF No. 128-3.) Griswold responded with the names and contact information of two people who were interested in the work. Pomrenke replied, "That is great. What do we pay them an hour?" (*Id.*) Griswold wrote back, "Jackson makes around 8 and Joe makes 15. I know that Joe does some side work for 10 when he is off." (*Id.*) Griswold did not know whether Pomrenke actually paid the two workers. Griswold testified that Pomrenke asked BVU mechanics to perform work on her personal vehicle on BVU time.

John Yates Merrell, Jr., a tax attorney, testified as a fact and expert witness for the defense. Bundy contacted him in March, 2014 on behalf of BVU, and BVU ultimately hired Merrill to assist in resolving certain tax issues. BVU asked him for advice on how best to handle cash and pre-paid debit card payments that had been made in 2012 and 2013. Merrell advised BVU to include the payments on amended W-2 forms and to file amended 941 forms, which are forms filed by a company that represent the wages paid and taxes owed in a given period. BVU followed that advice in 2014.

BVU's total payroll exceeded $8,000,000 per year. The amended filings resulted in an additional $3,400 of taxes owed for 2012 and approximately $1,400

90

of taxes owed for 2013. The portion owed by BVU amounted to approximately three hundredths of one percent of the total payroll.

Merrell explained that Czech, the IRS agent, had used a flat rate of 25% withholding in her calculations of tax due and owing. According to Merrell, the average BVU employee would not have had such a high rate of withholding. The applicable IRS publication says that a person earning $40,450 per year should have a withholding rate of 14% percent, which includes the 7.65% withholding for the employee's share of employment taxes in addition to federal income tax withholding. When Merrell applied to Czech's calculations what he opined was the correct withholding rate to the unreported wages, the amount of federal income tax owed came down to $15,000 from the $61,760 calculated by Czech. Adding in the employer and employee shares of FICA taxes yields a total of $36,182, about half of the $72,000 calculated by Czech. In other words, using the government's own calculations but simply adjusting the withholding rate resulted in an average amount of additional taxes owed of $3,289 per year over the eleven year period at issue. About $1,000 per year, on average, would have been owed by BVU, while the remainder would have been owed by the employees. Merrell testified that for a person making $42,000 per year who was married and filing jointly, an additional $25 or $50 in income would not increase the amount of federal income tax due.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 91 of 140   Pageid#: 5671

Merrell stated that BVU could have used its corporate membership at the Country Club for business meetings and events. When a company has a membership for business purposes, the membership dues are tax deductible to the company because they are business expenses. According to Merrell, Czech incorrectly attributed the BVU corporate membership dues to individuals, including Pomrenke. Removing the Country Club corporate membership dues from Czech's calculation, but keeping the individual membership dues, would further reduce the amount of tax due from BVU to $32,043.20, or about $2,913 per year.

Merrell further explained that because personal use of vehicles had in fact been included on W-2s for 2012, Czech's calculations were wrong to the extent they included 2012 vehicle usage in untaxed income. Removing the value of personal use of BVU vehicles for 2012 reduced the amount of tax owed to $30,929.20, or an average of $2,811.75 per year. Merrell further testified that Czech improperly assumed the percentage of personal use of company vehicles for the years 2004 through 2011 even though she admitting having no records evidencing the amount of personal use versus business use for those years. He opined that the value of personal use of vehicles between 2004 and 2011 should not have been included at all. Removing that value from the amount of tax owed would reduce the total tax owed to $18,050.54, or $1,640.96 per year.

92

When BVU filed adjusted quarterly federal tax returns for 2012 and 2013, Pomrenke signed those forms indicating that BVU had underreported wages. On cross examination, Merrell admitted that while the average annual salary for BVU employees was $40,450, some of the people who had unreported income, including Rosenbalm and Pomrenke, who received individual Country Club memberships, had much higher salaries. As a result, his calculation of a 14 percent tax rate was somewhat lower than it should have been.

The defense introduced an email exchange between Rosenbalm and Pomrenke that took place on July 16, 2013. Rosenbalm sent an email to jon@corporatepr.com, copying Pomrenke, that stated:

> We have an urgent matter I need you to take care of for me. The May invoice came in to BVU with time (4.1 hours) charged to BVU for things done for TCCS. That cannot be done and puts us in a very bad light. Please bill the 4.1 hours to me and reissue the May BVU bill without this time.

(Def. Ex. 62 at 2, ECF No. 128-8.) Pomrenke responded to Rosenbalm alone:

> And Wes I pray that everything done with Corporate Image for TCCS is above board and Jon is not using the guaranteed BVU retainer to do the work for TCCS. Again, I would feel more comfortable if effective today we cancel the Corporate Image retainer. I cannot risk anything of this nature, specifically to my job as CFO and the fiduciary responsibilities that comes with it. Thank you.

(*Id.*) After an initial brief response, Rosenbalm wrote the following to Pomrenke:

> Over the years I have let too many emails like this go. I am not going to this time.

I resent the implication below that I am not cutting off Corporate Image because they do work for TCCS. They have not done anything for TCCS in years, this last meeting was the first since TCCS had them on retainer years ago. This is a direct attack on my integrity and I am not going to stand for that. In fact you go so far below to implicate me and a Tennessee State Delegate in some type of kick-back scheme for a Christian School, and in an email at that.

I have told you time and time again why I was keeping Corporate Image but you don't agree with it so therefore it is wrong or there must be another reason. I had a valid reason to hold off until I knew what was going to happen. Go talk to Walt and Faith and report this since you feel something is inappropriate and let's stop playing these games. I am the one that has to run BVU and be accountable for all this and I do not operate this way.

(*Id.* at 1.)

The defendant did not testify.

III.

A. Motions for Judgment of Acquittal.

On review of a motion for acquittal under Rule 29, the court "must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *Burks v. United States,* 437 U.S. 1, 17 (1978). In the context of a criminal conviction, the Fourth Circuit has defined substantial evidence as "that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *United States v. Newsome*, 322 F.3d 328, 333 (4th Cir. 2003) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en

94

banc)). The court should consider "circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982). In making this determination, I must not weigh the evidence or assess the credibility of witnesses, since that is the job of the jury. *Burks*, 437 U.S. at 17. After carefully reviewing the trial record, I conclude that the jury was presented with sufficient evidence to support its verdicts of guilt.

### 1. Corrupt Intent and Quid Pro Quo.

Regarding Counts Five and Seven through Fifteen, the defendant contends that the government failed to prove any corrupt intent on the part of the vendors who gave things of value to Pomrenke and BVU. According to the defendant, "[w]ithout proof that these small gifts were intended to influence Ms. Pomrenke to take certain favorable action, their receipt did not violate the statutes under which Ms. Pomrenke was charged." (Mem. in Supp. of Mot. for J. of Acquittal 8, ECF No. 189.)

"To establish a conspiracy under § 371, the Government must prove (1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy." *United States v. Adams*, 638 F. App'x 189, 192 (4th Cir.) (unpublished), *cert. denied sub nom. Ward v. United States*, 136 S. Ct. 2031 (2016).

95

The extortion statute under which Pomrenke was convicted states,

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The statute defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "To prove extortion by fear of economic harm, the government must establish that the threat of such harm generated fear in the victim. The victim's state of mind is relevant, and the government may show not only what a defendant said but also what a victim believed about the situation." *United States v. Hairston*, 46 F.3d 361, 365 (4th Cir. 1995). In this case, the government charged extortion under color of official right as an alternative to extortion by fear of economic harm. "To prove this offense, the Government 'need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *Ocasio v. United States*, 136 S. Ct. 1423, 1428 (2016) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). The Fourth Circuit has held that "the government must prove a quid pro quo when it charges extortion under color of official right." *Hairston*, 46 F.3d at 365.

The program bribery statute that Pomrenke was convicted of violating states, in relevant part:

> Whoever . . . being an agent of . . . a State [or] local . . . government,
> or any agency thereof—
>
> . . .
>
> (B) corruptly solicits or demands for the benefit of any person, or
> accepts or agrees to accept, anything of value from any person,
> intending to be influenced or rewarded in connection with any
> business, transaction, or series of transactions of such . . . government,
> or agency involving any thing of value of $5,000 or more;
>
> . . .
>
> shall be fined under this title, imprisoned not more than 10 years, or
> both.

18 U.S.C. § 666(a). The relevant intent under this subsection is Pomrenke's, not the vendor's. The question is whether Pomrenke "corruptly solicit[ed] or demand[ed]" things "intending to be influenced or rewarded." *Id.*

Honest services wire fraud is a crime housed in the wire fraud statute. The wire fraud statute states:

> Whoever, having devised or intending to devise any scheme or artifice
> to defraud, or for obtaining money or property by means of false or
> fraudulent pretenses, representations, or promises, transmits or causes
> to be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any writings, signs,
> signals, pictures, or sounds for the purpose of executing such scheme
> or artifice, shall be fined under this title or imprisoned not more than
> 20 years, or both.

18 U.S.C. § 1343. "[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The Supreme Court has held that § 1346 encompasses only bribery and kickback schemes. *Skilling v. United States*, 561 U.S. 358, 409 (2010). To convict a person of honest services wire fraud, the government must prove that the scheme

97

was undertaken with the specific intent to defraud. *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

"[I]ntent can be implied — and it is the jury's role to make such factual inferences." *United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012). Interpreting a different but related bribery statute, 18 U.S.C. § 201, the Fourth Circuit has explained that "the government is not required to prove an expressed intention (or agreement) to engage in a quid pro quo. Such an intent may be established by circumstantial evidence. . . ." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (internal quotation marks and citations omitted).

I find that there was sufficient evidence for a reasonable fact-finder to conclude that both Pomrenke and the vendors in question possessed the requisite criminal intent for Pomrenke to be guilty of the crimes charged. Pomrenke directed Copeland to solicit a $15,000 contribution for an employee Christmas party from ETI at a time when ETI was working on a major federally funded project and routinely submitting invoices to BVU that had to be signed by Pomrenke. Pomrenke was involved in deciding which vendors would be asked to sponsor BVU parties in 2012, and ETI was chosen because it was one of BVU's biggest construction vendors. Copeland testified that he believed ETI would have lost work had ETI refused to pay for the Christmas party. Pomrenke asked that

ETI pay the event facility directly for the Christmas party rather than paying BVU, suggesting that she did not want the payment on BVU's books.

Pomrenke also directed Copeland to request a spa services gift card from ETI in place of the standard year-end gift. BVU was a very important client of ETI, comprising approximately 30% to 35% of ETI's revenue. ETI made a large investment in order to work for BVU and hired a number of people in the area. Losing the BVU contracts would have jeopardized ETI financially and likely would have put a number of ETI's employees out of work.

Pomrenke directed Lane to request $5,500 for a children's Christmas party from Alcatel during a time when Alcatel was seeking continued business from BVU. Simms testified that it was important to him to keep the BVU account and maintain the good will of BVU, so Alcatel paid the money. Pomrenke had been present at a BVU board meeting in 2009 when the board adopted a conflict of interest policy that prohibited BVU personnel from accepting anything of value in excess of $500 from a vendor.

Pomrenke asked BPH for Cincinnati Reds tickets in the same time period during which certain BVU insurance policies were up for renewal, and Pomrenke discussed the tickets and the policy renewals in the same email. Pomrenke was the BVU representative to whom BPH sent premium invoices. Pomrenke was also heavily involved in the bidding process for insurance policies, and if Powers had a

99

question about a proposal he was submitting, he would contact Pomrenke.  Powers testified that one reason he gave tickets to Pomrenke was because he wanted to keep BVU's business.  Since Rosenbalm resigned from BVU, BPH has not provided tickets to BVU officers, and BPH is no longer BVU's insurance agency.

On September 28, 2011, Pomrenke stated that she was "ready to pull the trigger on the ViaMedia contract" even though no RFP had been issued at the time. (Gov't Ex. 60, ECF No. 113-12.)  Pomrenke then issued an RFP a little less than a month later and privately contacted Ervin to ensure that he had received it.  Less than a month after the RFP was issued and before the contract was awarded, Ervin offered Pomrenke four tickets to a University of Kentucky basketball game in response to her request.  She expressly told him to wait to give her the tickets until after the contract was awarded, stating that she did not "want it construed as a gift during our process."  (Gov't Ex. 66, ECF No. 113-19.)  Ervin replied that he understood her request and testified at trial that giving a gift during the RFP process might influence the process.  The RFP contained a Vendor Ethics Policy that stated, "gifts or kickbacks shall never be solicited or accepted."  (Gov't Ex. 35 at 13, ECF No. 128-13.)

About a month after Ervin offered Pomrenke the tickets and just days after the basketball game took place, Pomrenke emailed the signed contract between BVU and ViaMedia to Ervin and requested "something other than bourbon" for

her Christmas gift the next year. (Gov't Ex. 67, ECF No. 113-20.) Ervin testified that he provided her with another Christmas gift that year, before the contract went into effect on December 31.

In September 2012, Pomrenke asked Ervin for Carolina Panthers tickets, and he replied that he could get them for her. ViaMedia did give her the tickets. Ervin stated that he could get the tickets for her because she was a good client.

BVU was a significant client of BB&T, maintaining an average account balance of around $10,000,000. On August 22, 2011, Shaver emailed Pomrenke to offer her suite tickets to a Friday night NASCAR race, but indicated that he probably would not be able to give her tickets to the Saturday night race. Pomrenke responded, "How can one of your best customers not get suite tickets for the Saturday race?" (Gov't Ex. 52, ECF No. 113-8.) In less than an hour, Shaver managed to secure tickets for Pomrenke. He wrote to her, "We really do appreciate your business." (*Id.*)

This evidence was sufficient for reasonable jurors to find that Pomrenke acted with the criminal intent required by the statutes under which she was convicted. While many of the vendor representatives who testified denied that they intended to engage in any quid pro quo, their credibility was a matter for the jury. The government presented enough evidence for the jury to conclude that the items of value given to Pomrenke were not mere gifts or gratuities, but were given

in exchange for official actions, namely the awarding of business and contracts to the vendors. The evidence was also sufficient for the jury to find the defendant guilty of the conspiracy charges set forth in Counts Five and Nine, as the record reveals a long-running practice of various BVU officials demanding and accepting items of value from vendors in exchange for the awarding of contracts and business. Pomrenke and her coconspirators communicated extensively about their schemes via email and in writing and took numerous overt acts to effect the objects of the conspiracies. The defendant's Motion for Judgment of Acquittal fails with respect to Counts five and seven through fifteen because the jury's verdicts on those counts are supported by sufficient evidence.

### 2. *De Minimis Amounts.*

Relying on *United States v. Paschall*, 772 F.2d 68, 71-72 (4th Cir. 1985), Pomrenke argues that the payments made to BVU and Pomrenke were of de minimis values that cannot support a conviction for extortion. In *Paschall*, the Fourth Circuit indicated that to convict a public official of extortion under § 1951, the item or amount given to the public official must be "something of significant value," meaning "of such value as to be calculated to influence the official's conduct." *Id.* The *Paschall* court affirmed the defendants' convictions, which were premised on "an expense-free weekend vacation at Hilton Head Island" and a "hunting vacation in Texas." *Id.* at 70.

Pomrenke was only convicted of one count of extortion, and that count was limited to the time period of November 2012 through January 2013. During that time period, Pomrenke directed Copeland to ask ETI to contribute $15,000 toward a Christmas party for BVU employees. The defendant has cited to no authority for the proposition that $15,000 can be considered de minimis. I find that a request for payment of $15,000, and an ultimate corresponding payment of $12,297.18, are of significant value to satisfy the statute's requirements. The defendant's argument that she demanded and received only de minimis gifts is not a convincing one.

### 3. Willfulness and Uncertain Duty.

Pomrenke has also moved for judgment of acquittal on counts one through four, the tax-related counts.[4] She again argues that the government failed to prove willfulness or a specific intent to defraud, and she further contends that there was

---

[4] The government contends that Pomrenke's motion for judgment of acquittal on the tax-related counts is untimely because it was filed one day after the deadline. Defense counsel has represented to the court that an electrical storm interrupted his internet connection, delaying his ability to connect to the court's electronic filing system and causing him to file the motion just moments after the deadline. I find that defense counsel has established excusable neglect for this late filing and decline to deny this motion on timeliness grounds. I will thus grant the motion for an extension of time to file this motion, at least to the extent that it raises grounds connected to a judgment of acquittal. "[T]here is only one ground for a motion for judgment of acquittal. This is that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment or information." *United States v. Hoover-Hankerson*, 406 F. Supp. 2d 76, 81-82 (D.D.C. 2005) (citation omitted), *aff'd*, 511 F.3d 164 (D.C. Cir. 2007).

substantial uncertainty regarding her duty to report fringe benefits on W-2 forms.[5]

The defendant's argument can be summarized as follows: (1) the government allegedly conceded that fringe benefits could have been reported on 1099 forms instead of W-2 forms; (2) BVU was not required to file 1099 forms for fringe benefits totaling less than $600 per employee per year; and (3) therefore, the W-2 forms filed with the Social Security Administration were not false to the extent that they failed to report fringe benefits of up to $600 per employee per year. This argument does not support acquittal.

The false statements statute under which Pomrenke was convicted provides, in relevant part:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; [or]
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; . . .
>
> . . . .

---

[5]  The defendant also asserts as a ground for acquittal that the court "erred in denying Defendant's motion to exclude Prosecution Exhibits 139 & 140 because the exhibits contained inadmissible evidence that was highly prejudicial to defendant and denied her constitutional rights to confrontation." (Mot. for J. of Acquittal Pursuant to Rule 29 of the Fed. R. Crim. P. — Tax Counts 2, ECF No. 192). She raises the same argument as a ground for a new trial. Because I find this issue is appropriately raised in support of a motion for a new trial, I address it in Part III.B.4, *infra*.

shall be fined under this title, imprisoned not more than 5 years . . . or both.

18 U.S.C. § 1001(a).

The following evidence presented at trial bears upon the questions of willfulness and the duty to report all employee compensation on W-2 forms.

Pomrenke served as BVU's second in command and oversaw all of the finances at BVU.  She has a bachelor's degree in accounting and held herself out as an experienced finance and accounting professional.  On her resume, she stated that she guided BVU policies and had oversight over all accounting functions, and that she directed all day-to-day accounting and finance operations, including cash management, payroll, and tax reporting.  Pomrenke's approval was required to enact any change in accounting procedures.  Pomrenke often signed petty cash receipts to indicate her approval of cash bonus payments to employees.

In 2007, Dobrovok informed Pomrenke and all other BVU employees by email that reimbursement for local meals was a fringe benefit that was taxable to the employee.  Nevertheless, for years after that, Pomrenke frequently charged local meals to her BVU credit card and did not institute any policy to ensure that such meals were included on her W-2 forms.

In audit documents submitted in the years 2009 through 2013, Pomrenke repeatedly represented to Brown Edwards that BVU did not employ any incentive

compensation plans, despite the fact that Pomrenke herself often handed out incentive bonuses in the form of cash or pre-paid debit cards.

Pomrenke purchased pre-paid debit cards to give to employees in September 2009, September 2010, and September 2011. Bundy told Pomrenke in December 2011 that it was improper to pay employees cash bonuses without withholding taxes and reporting the income. Nevertheless, the practice continued. In October 2013, Bundy talked to Pomrenke about the practice of giving employees cash and pre-paid debit cards.

Boothe told Pomrenke in 2010 or 2011 that he was concerned that personal use of company vehicles was not being reported to the IRS. On December 8, 2010, Boothe expressly advised Pomrenke that bonuses had to be run through payroll and that if they were not, BVU could be liable for failure to pay the employer portion of Social Security and Medicare taxes. For several years after that email exchange, Pomrenke continued to give employees pre-paid debit cards and cash bonuses.

On March 4, 2011, Boothe sent an email to Pomrenke explaining that personal use of vehicles and cash bonuses needed to be reported as employee wages. Pomrenke made no changes regarding personal use of BVU vehicles for more than a year after Boothe sent her the email.

In April 2011, Boothe sent Pomrenke a spreadsheet in which he estimated that her personal use of her BVU vehicle resulted in a taxable benefit to her of

about $9,000 per year. Even so, BVU's tax filings for the 2011 tax year did not report personal use of BVU vehicles. On July 25, 2012, Boothe wrote to Pomrenke that Brown Edwards had advised him that vehicle allowances should be reported on W-2 forms, not 1099 forms.

On June 27, 2013, Boothe wrote to Pomrenke that payments of cash and cash equivalents are never excludable from employees' income. He attached IRS Publication 15-B. She then agreed to add cash and gift card amounts to employee W-2s.

BVU eventually issued amended W-2 forms for all employees in 2014 to account for cash bonuses and pre-paid debit cards, but it only did so for the tax years 2012 and 2013. Even after that decision was made and after the government had been investigating BVU for a year, Bundy still felt the need to specifically instruct Pomrenke in writing to be sure that upcoming employee incentive payments were taxed as normal payroll.

From 2005 through 2013, BVU reported some fringe benefits for some employees on 1099 forms. A person who receives benefits totaling less than $600 per year does not have to be issued a 1099 form. But the government introduced records showing that Pomrenke had received untaxed benefits totaling more than $600 per year, as had other employees. The advantage to including a benefit on a 1099 instead of a W-2 is that there is no tax withholding on a 1099. However,

Boothe testified that 1099s are supposed to be used for independent contractors, not for employees who are also receiving W-2s.

BVU changed its practice with regard to personal use of vehicles in 2012, after Boothe told Pomrenke that he would not certify to the auditors that BVU was in compliance with laws and regulations. Pomrenke then spoke to Rosenbalm about the issue and the practice was changed. BVU began to calculate the taxable portion of vehicle use, and that amount was included on employees' pay stubs going back to January 1, 2012. Pomrenke did not own a personal vehicle and estimated that she used her BVU vehicle for personal use 65% of the time in 2012. Lane and Bundy also estimated that more than half of their BVU vehicle use was personal.

BVU did not issue amended W-2s to account for personal use of BVU vehicles in years prior to 2012. Similarly, individual Country Club memberships for Pomrenke and others were reported on W-2 forms for the year 2015, but BVU did not issue amended W-2s to account for the membership dues paid in previous years.

When BVU asked Merrell for advice regarding unreported compensation and benefits, Merrell was only asked to address cash and pre-paid debit card payments made in 2012 and 2013. BVU did not ask him about unreported compensation for other years, despite knowledge by Pomrenke, Bundy, and others

that the practice of giving employees cash and pre-paid debit cards had been in place for many years. Merrell, Pomrenke's own expert witness, testified that cash and cash equivalent payments should have been reported on W-2 forms. He did not contest that personal use of BVU vehicles and Country Club memberships were taxable to the employees who benefitted from them.

Pomrenke was aware that payments had been made to BVU employees outside the payroll system and that those payments were not reflected on the forms filed with the IRS, but she approved the forms nonetheless. When BVU filed adjusted quarterly federal tax returns for 2012 and 2013, Pomrenke signed those forms indicating that BVU had underreported wages. Yet, as noted above, she did not take any action to correct erroneous reportings made in previous years.

This evidence was sufficient for reasonable jurors to conclude that (1) Pomrenke, in her role as CFO of BVU, had a clear duty to report payments of cash and pre-paid debit cards on W-2 forms; (2) Pomrenke, in her role as CFO of BVU, had a clear duty to report personal use of BVU vehicles on W-2 forms; (3) Pomrenke was aware of those duties; (4) Pomrenke willfully made false statements to the Social Security Administration by signing and directing the filing of W-2 forms for the 2010, 2011, and 2012 tax years that she knew did not accurately reflect all compensation and benefits provided to BVU employees; and (5) Pomrenke conspired with Rosenbalm and others (a) to defraud the United

Stated by impeding the functions of the IRS in computing and collecting taxes, and (b) to willfully make materially false statements to the Social Security Administration. Even if the jury were to accept the defense's theory that certain benefits could have been properly reported on 1099 forms instead of W-2 forms, the jury could still have found Pomrenke guilty because she and others received benefits that were not reported on W-2s *or* 1099s, and those benefits in some cases exceeded $600 per employee per year. For these reasons, the defendant's Renewed Motion for Judgment of Acquittal will be denied.

### 4. *Official Acts.*

Several months after the trial in this case, the Supreme Court issued its decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). The issue in the *McDonnell* decision was "the proper interpretation of the term 'official act'" as used in 18 U.S.C. § 201. *Id.* at 2367. McDonnell was convicted of extortion under 18 U.S.C. § 1951(a), conspiracy to commit extortion, honest services wire fraud under 18 U.S.C. §§ 1343 and 1346, and conspiracy to commit honest services wire fraud under 18 U.S.C. § 1349. In *McDonnell*, "[t]he parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201."[6] *Id.* at 2365.

---

[6] The parties expressed no such agreement in this case.

110

Section 201 prohibits a public official from "directly or indirectly, corruptly" demanding, seeking, receiving, accepting, or agreeing "to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). The statute defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). The government accused McDonnell, who was at the time Governor of Virginia, of performing the following "official acts" in exchange for items of value provided by the CEO of Star Scientific, a company that developed and marketed a nutritional supplement called Anatabloc:

> (1) "arranging meetings for [Williams] with Virginia government officials, who were subordinates of the Governor, to discuss and promote Anatabloc";
>
> (2) "hosting, and ... attending, events at the Governor's Mansion designed to encourage Virginia university researchers to initiate studies of anatabine and to promote Star Scientific's products to doctors for referral to their patients";
>
> (3) "contacting other government officials in the [Governor's Office] as part of an effort to encourage Virginia state research universities to initiate studies of anatabine";
>
> (4) "promoting Star Scientific's products and facilitating its relationships with Virginia government officials by allowing [Williams] to invite individuals important to Star Scientific's business to exclusive events at the Governor's Mansion"; and

(5) "recommending that senior government officials in the [Governor's Office] meet with Star Scientific executives to discuss ways that the company's products could lower healthcare costs."

*Id.* at 2365-66 (record citation omitted). The defendant argued, and the Supreme Court ultimately concluded, that these were not "official acts" within the acceptable construction of § 201.

The Court interpreted the "question, matter, cause, suit, proceeding or controversy" referenced in § 201(a)(3) to mean "a formal exercise of governmental power," similar in nature to "a lawsuit, hearing, or administrative determination." *Id.* at 2368. "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed — the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id*. at 2369. The matter must be "something within the specific duties of an official's position — the function conferred by the authority of his office." *Id.* The matter "may be pending either before the public official who is performing the official act, or before another public official." *Id.*

The Court found that initiation of state university studies, allocation of state grant money for studies, and coverage of a drug by a state employee health insurance plan were questions or matters within the meaning of §201(a)(3). *Id.* at 2369-70. However, the Court held that "hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or

action' within the meaning of § 201(a)(3), even if the event, meeting, or speech is related to a pending question or matter." *Id.* at 2370. Rather, "the public official must make a decision or take an action *on* that question or matter, or agree to do so." *Id.*

"It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*. The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question." *Id.* at 2371. The Court also clarified that setting up a meeting or making a phone call is not always irrelevant.

> If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id.*

In this case, Pomrenke's honest services wire fraud convictions were premised on her agreements to perform the following official acts, as charged in the Indictment and asserted by the government:

1. Award BVU contracts to ETI (Counts Ten and Fourteen);

2. Maintain a significant BVU deposit account at BB&T and continue to use various BB&T banking services (Count Eleven);

113

3. Award ViaMedia a BVU contract (Counts Twelve and Thirteen);

4. Renew BVU insurance policies with BPH (Count Fifteen).

Pomrenke's extortion conviction was based on her agreement to award contracts to ETI, or her infliction of fear of economic loss based on the consequences that would occur if she did not award contracts to ETI. Pomrenke's program bribery conviction rested on her agreement to purchase products and services from Alcatel or her agreement to award contracts to ETI.[7]

These acts, which were the only alleged official acts that the jury was asked to consider, all fall squarely within *McDonnell*'s limited construction of the term "official action." The award of a contract by a public entity is "a formal exercise of governmental power," similar in nature to "a lawsuit, hearing, or administrative determination." *See McDonnell*, 136 S. Ct. at 2368. The process is governed by

---

[7] It is important to note that the extortion statute does not actually refer to "official action," but merely refers to obtaining property "under color of official right." 18 U.S.C. § 1951(b)(2). However, because "the government must prove a quid pro quo when it charges extortion under color of official right," *Hairston*, 46 F.3d at 365, and given the Supreme Court's concerns about the constitutionality of broadly defining the requisite "quo," *McDonnell*, 136 S. Ct. at 2372-73, I will assume for purposes of this opinion that a defendant must have agreed to perform an official action in order to be convicted of extortion under color of official right.

Likewise, the program bribery statute does not refer to "official action," but instead addresses "any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B). The parties, however, have grouped all of the non-tax-related charges together in their discussions of the effect of the *McDonnell* case, so I will discuss them together here.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 114 of 140   Pageid#: 5694

the Procurement Act and subject to strict requirements. The evidence demonstrated that while the BVU Board of Directors may have had final approval over contracts, Pomrenke possessed the real power, along with her co-conspirator Rosenbalm, to decide who did business with BVU. Other co-conspirators, such as Copeland and Lane, also played a significant role in deciding who would be awarded certain contracts. But those people worked for Pomrenke, and their decisions were subject to her approval as CFO. Pomrenke wrote, "I am ready to pull the trigger on the ViaMedia contract" before any RFP was issued, indicating that she believed she had the power to award the contract. (Gov't Ex. 60, ECF No. 113-13.) Todd Edwards testified that Copeland told him that Pomrenke and Rosenbalm would have to approve the bids before contracts were awarded.

This evidence was sufficient for the jury to conclude that Pomrenke had the power to perform the official acts in question and that she agreed to perform them in exchange for receiving items of value from vendors. Therefore, I will deny the defendant's Motion for Judgment of Acquittal to the extent that it is based on the *McDonnell* decision.

## B. Motions for a New Trial.

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Any motion for a new trial grounded on any

reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). In this case, the defendant failed to timely file a motion for new trial. I may extend the time for filing if the defendant failed to file by the deadline due to excusable neglect. *See* Fed. R. Crim. P. 45(b)(1).

Here, there has been no showing that the defendant's failure to file a timely motion was the result of excusable neglect. To the contrary, the court had already granted two motions for extensions of time to file a motion for judgment of acquittal, without any indication from the defendant that she also desired to file a motion for a new trial. An extension of time granted only as to a motion for judgment of acquittal does not cover a motion for a new trial. *Hoover-Hankerson*, 406 F. Supp. 2d at 89. The defendant has offered no good reason why she did not also request an extension of time to move for a new trial. "[A] party that fails to act with diligence will be unable to establish that [her] conduct constituted excusable neglect." *Martinez v. United States,* 578 F. App'x 192, 194 (4th Cir. 2014) (unpublished) (quoting *Robinson v. Wix Filtration Corp.,* 599 F.3d 403, 413 (4th Cir. 2010)). The defendant's motions for new trial are untimely and must be denied on that ground.

Nevertheless, even if the court were to consider the defendant's motions for a new trial on the merits, the motions would not be granted. Courts have "widely

agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz,* 605 F.3d 359, 373 (6th Cir. 2010). "[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall,* 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright et al., *Federal Practice and Procedure* § 556 (3d ed. 2004)). For the reasons that follow, I find that no substantial legal error has occurred to warrant a new trial.

### 1. Implied Juror Bias.

The defendant asserts that the jury pool was tainted and biased because I refused to exclude jurors who were BVU customers. She has filed a local newspaper article linking BVU rate increases to the federal investigation and criminal cases. According to the article, the rate increases amounted to approximately $10 per month for most customers. The defendant contends that BVU customers on the jury therefore had a financial interest in the outcome of this case.

Of the twelve jurors who returned the verdict, four of them had used one or more of BVU's services (Jurors Davenport, Jacobs, Martino, and Smith) and another (Juror Williams) had an employer who used BVU's services. All of these jurors were asked in voir dire their opinions of BVU and none had a negative opinion, *e.g.*, Davenport ("an excellent service") (Trial Tr. 133, Feb. 16, 2016,

ECF No. 156); Jacobs ("experience with BVU has always been good") (*id.* at 137); Martino ("okay") (*id.* at 142); Smith (no opinion) (*id.* 154); Williams ("satisfactory") (*id.* at 157). Only two prospective jurors indicated that they had negative opinions about BVU (Jurors Anderson and Creed) (*id.* at 122-24, 130), and neither of them served on the jury, Anderson being excused by the court and Creed being struck by the defense.

None of the jurors who used BVU services were asked in voir dire whether they would consider in deciding the case the possible effect of any charged criminal wrongdoing on the financial situation of BVU. Following an explanation of those charges, none of the jurors indicated that they knew of any reason why they could not be completely fair and impartial in deciding the case, without bias or prejudice. (*Id.* at 58-59.)

According to the testimony, BVU's gross annual income at the time of the events in question in this case was over $100,000,000. (Trial Tr. 4, Feb. 17, 2016, ECF No. 157.)

"[T]he doctrine of implied [juror] bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). Such a situation is not present here.

Though several jurors who were BVU customers stated during voir dire that they had heard about this case in the news, none of the jurors said anything about rate increases, nor did any of the jurors state that they believed they had a financial stake in the outcome of this case. The jury was not presented with any evidence demonstrating that BVU rates had increased as a result of the crimes charged. There is no reason to believe that the outcome of this criminal case against Pomrenke will affect BVU's customer rates or charges. Contrary to the defendant's assertion, allowing BVU customers on the jury was not the equivalent of allowing a corporate party's shareholders to serve as jurors. *See, e.g.*, *Getter v. Wal-Mart Stores, Inc.* 66 F.3d 1119, 1122 (10th Cir. 1995) (holding that juror who owned stock in defendant company and whose wife was employed by defendant company should have been dismissed for cause); *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 971-72 (4th Cir. 1971) (holding that trial court should have stricken for cause a juror who owned stock in the defendant company). This case is instead akin to cases in which courts have found that a juror's potential financial interest was too remote and tentative to require dismissal for cause. *See, e.g., United States v. Bizzell*, Nos. 92-6008, 92-6166, 1993 W.L. 411470, at *4-6 (10th Cir. Aug. 17, 1993) (unpublished) (finding that juror who was insured by Department of Housing and Urban Development ("HUD") and might have become entitled to distributive share of HUD surplus funds was properly permitted to serve in

119

criminal case in which defendants were charged with defrauding HUD); *United States v. DeLillo*, 620 F.2d 939, 948 (2d Cir. 1980) (In case charging conspiracy to defraud the United States in construction of a federally funded sewer project, trial court did not err in rejecting a blanket challenge to all potential jurors who were served by the sewer system.) Any pecuniary interest on the part of BVU customers was too indirect, uncertain, and insubstantial to require their dismissal for cause. The defendant's Motion for New Trial on the ground of implied juror bias is denied.

### 2. *Whistleblower Statements.*

The defendant next argues that it was error to preclude Esposito from testifying about a conversation she had with Pomrenke in which Pomrenke allegedly notified Esposito of certain wrongdoing by Rosenbalm. I excluded this testimony as hearsay not falling within any exception thereto. The defense contends that Pomrenke's statements to Esposito were offered to show Pomrenke's state of mind rather than the truth of the matters asserted, rendering the statements nonhearsay and bringing them within the exception for present sense impressions or then-existing mental or emotional conditions. The defense further argues that Esposito at least should have been permitted to testify to when the statements were made and what actions she took in response to the statements, though the government argues this testimony would have been irrelevant to the charges.

120

The Federal Rules of Evidence define hearsay as any statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is generally inadmissible. Fed. R. Evid. 802. However, an exception exists for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). Another exception allows the introduction of

> [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(3).

Though the defense did not proffer to the court exactly what Esposito was expected to say, the government represented that "Ms. Esposito will be presenting evidence in some fashion that Ms. Pomrenke was a whistle blower, or started this investigation." (Trial Tr. 146, Feb. 24, 2016, ECF No. 165.) As I stated when ruling on this issue at trial, in order to accept that the statements made by Pomrenke were "whistle blower" statements, I have to consider them for the truth of the matters asserted, whatever those matters were. I find that the defendant offered these statements in an attempt to show the truth of the matters discussed. The statements were not present sense impressions because the defense has not

121

indicated that Pomrenke was describing something she was observing at the time or immediately after perceiving it. The statements were not describing Pomrenke's then-present state of mind because if she was telling Esposito about wrongdoing by Rosenbalm, then she was necessarily making "a statement of memory or belief to prove the fact remembered or believed." *See* Fed. R. Evid. 803(3). Additionally, by the time this conversation allegedly occurred, shortly before the government began investigating BVU, most of the acts that serve as the basis of the charges against Pomrenke had already taken place. Therefore, Pomrenke's state of mind at that time would not be relevant, even as to the conspiracy charges. Finally, any actions taken by Esposito based on Pomrenke's statements would be completely irrelevant to the crimes charged. Moreover, to the extent the defense sought to show the jury that Pomrenke ultimately did a commendable act by reporting misconduct to Esposito, that would be inadmissible evidence of the defendant's good character. *See* Fed. R. Evid. 405(b) (A person's character may only be proved by evidence of specific conduct if the person's character is an essential element of a charge or defense.).

For these reasons, I find that the so-called "whistle blower" statements Pomrenke allegedly made to Esposito were properly excluded as inadmissible hearsay and not relevant to the issues before the jury.

Case 1:15-cr-00033-JPJ-PMS   Document 219   Filed 08/01/16   Page 122 of 140   Pageid#: 5702

### 3. Failure to Give Gratuity Instruction.

Pomrenke next urges me to grant her a new trial on the program bribery and honest services wire fraud counts because I declined to instruct the jury on the definition of a gratuity and the difference between a gratuity and a bribe. The defense's argument in this regard is based on case law interpreting 18 U.S.C. § 201, another bribery statute that is related to, but different from, the statutes under which Pomrenke was charged.

The issue is "whether, taken as a whole, the [challenged] instruction fairly states the controlling law." *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990.) In assessing the adequacy of jury instructions, the court should view the instructions as a whole, as there is "'no ground for complaint that certain portions, taken by themselves and isolated, may appear to be ambiguous, incomplete or otherwise subject to criticism.'" *Smith v. Univ. of N.C.*, 632 F.2d 316, 332 (4th Cir. 1980) (quoting *Laugesen v. Anaconda Co.*, 510 F.2d 307, 315 (6th Cir. 1975)). "[A]n error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Wellington v. Daniels*, 717 F.2d 932, 938 (4th Cir. 1983).

Section 201(b) prohibits bribes, while § 201(c) prohibits illegal gratuities. Bribery under § 201(b) is punishable by imprisonment for a term of up to fifteen years, while payment or acceptance of illegal gratuities under § 201(c) is

punishable by a term of imprisonment of up to two years. *See* 18 U.S.C. § 201(b), (c). Therefore, for purposes of § 201, it matters whether a jury finds a defendant guilty of giving or receiving gratuities as opposed to giving or receiving bribes. "Whether a payment is a bribe or an illegal gratuity under § 201 depends on the intent of the payor. A bribe requires that the payment be made or promised 'corruptly,' that is, with 'corrupt intent.'" *Jennings*, 160 F.3d 1013. To convict a defendant of bribery under § 201, the defendant must have engaged in a quid pro quo. *Id.* In contrast, a gratuity "is a payment made to an official concerning a specific official act (or omission) that the payor expected to occur in any event. No corrupt intent to influence official behavior is required. The payor simply must make the payment 'for or because of' some official act." *Id.* (quoting § 201(c)).

The Fourth Circuit has expressly held that a trial court's refusal to give a gratuity instruction in a program bribery case was not an abuse of discretion. *Hamilton*, 701 F.3d at 410. The court found that the trial court had "properly instructed the jury on the specific requirements under § 666, including corrupt intent, which might not be required for gratuity." *Id.* The court explained:

> Although we have not yet ruled as to whether § 666 covers gratuities as well as bribes, *see Jennings*, 160 F.3d at 1015, even if the statute does cover gratuities, failure to instruct on gratuity could not have prejudiced Hamilton in any way. Section 666 provides no less severe sentence for gratuities; thus instructing the jury as to gratuity would only have provided an additional ground on which to convict Hamilton. *See* 18 U.S.C. § 666.

*Id.* Pomrenke's argument clearly fails as to Count Eight.

In *Skilling*, the Supreme Court held that the crime of honest services wire fraud encompasses only bribes and kickbacks. 561 U.S. at 409. Pomrenke argues that bribery within the scope of the honest services wire fraud statutes has the same meaning as bribery under by § 201(b). A bribery conviction under § 201(b) requires a finding of a quid pro quo. *Jennings*, 160 F.3d at 1013. The Fourth Circuit has stated that "when there is some evidence to suggest that the defendant's payment was a gratuity as defined in § 201(c), the trial court must at the defendant's request instruct the jury on the lesser-included offense of 'illegal gratuity.'" *Jennings*, 160 F.3d at 1019.

Consistent with *Skilling*, the jury instructions in this case limited the honest services wire fraud counts to bribery. I explained to the jury that quid pro quo means "that the defendant solicited, demanded, accepted, or agreed to accept a thing of value in return for a specific exercise of her official power, commonly known as a 'bribe.'" (Jury Instr. 33, ECF No. 137.) I defined quid pro quo as "an exchange of 'this for that.'" (*Id.* at 30.) However, the defendant specifically requested an instruction explaining the difference between a gratuity and a bribe, and I declined to give such an instruction. If the Fourth Circuit's analysis in *Jennings* applies to honest services wire fraud, then my failure to instruct the jury on the difference between a gratuity and a bribe was error.

However, I find that any error in my refusal to give a gratuity instruction was harmless. An error is harmless where "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. California,* 386 U. S. 18, 24 (1967)). The court must conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Weaver,* 282 F.3d 302, 314 (4th Cir. 2002) (internal quotation marks and citations omitted).

I have already found that the jury was presented with sufficient evidence to convict Pomrenke of honest services wire fraud. The jury instructions described the alleged schemes supporting the honest services wire fraud counts as bribery, and they equated a quid pro quo with a bribe and explained that the receipt of items of value must have been "in return for a specific exercise of her official power." (*Id.* at 33.) I find that the instructions, as a whole, conveyed to the jury that in order to convict Pomrenke of honest services wire fraud, it had to find that she had engaged in a quid pro quo. Therefore, despite any error in the instructions, I decline to grant Pomrenke a new trial.

### 4. Testimony of Government's Tax Expert.

Pomrenke raises several arguments related to the testimony of the government's tax expert, IRS agent Czech. First, she contends that Government

126

Exhibits 139 and 140, summary exhibits prepared and discussed by Czech, contained inadmissible hearsay that was prejudicial to Pomrenke and denied Pomrenke her constitutional right to confront witnesses against her. Exhibit 139 was a spreadsheet that showed the amounts of unreported income in the form of cash bonuses, personal use of BVU vehicles, and Country Club dues for certain employees. The exhibit included calculations of what the tax withholding should have been for each year, as well as calculations of the total tax due and owing based on the unreported income. Exhibit 140 was a spreadsheet showing Pomrenke's unreported income in the form of personal use of vehicles and Country Club dues, and a calculation of Pomrenke's tax due and owing based on her own unreported income.

> Rule 703 of the Federal Rules of Evidence provides that an expert witness
>
> may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. However, the Confrontation Clause of the Sixth Amendment prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *United States v. Palacios*, 677 F.3d 234, 243

127

(4th Cir. 2012) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). The Confrontation Clause "forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). An expert's reliance on testimonial hearsay "only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *Id.* at 635.

The defense does not identify any particular testimonial statements contained in Government Exhibits 139 and 140. Czech testified that she based her calculations on BVU business records that had been provided to her by the government. In cross examination, defense counsel had the ability to ask Czech where she obtained the numbers shown on the spreadsheet. Nothing in Czech's testimony indicated that she relied on testimonial hearsay, and she did not "simply . . . parrot 'out of court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion.'" *Id.* (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)). Moreover, there was ample evidence presented at trial that supported Czech's opinions and calculations. Pomrenke's claim that the admission of Government

Exhibits 139 and 140 violated her rights under the Confrontation Clause lacks merit.

Second, Pomrenke argues that the exhibits should not have been admitted because they included calculations based on assumptions that had no basis in fact. Regarding employees' personal use of vehicles, Czech reviewed records estimating the percentage of personal use versus business use for the 2012 tax year, but she did not receive information regarding the percentage of use that was personal in the previous years. From other evidence presented at trial, it appears that BVU did not attempt to collect that information from employees for years prior to 2012. Therefore, when calculating the tax due and owing due to unreported personal use of vehicles, Czech assumed that the personal use percentages in prior years were the same as in 2012. She testified that she commonly makes these kinds of assumptions when conducting audits of taxpayers because taxpayers often do not have all of the relevant records for every year. Defense counsel appropriately cross-examined Czech regarding her assumptions, and the jury was allowed to consider the inclusion of assumptions when determining how much weight to give to Czech's calculations and opinions. The fact that Czech made some assumptions when calculating the amount of tax due and owing goes to the weight of her testimony, not its admissibility. In truth, Czech's calculations were not particularly relevant to the issue of guilt or innocence. Whether Pomrenke knowingly failed to

report $10,000 of income or $1,000,000 of income, the jury could have found her guilty of making false statements to the Social Security Administration. The false statements statute does not require proof of any threshold amount of unreported income. I find no error in the admission of Government's Exhibits 139 and 140.

Third, Pomrenke asserts that I should not have permitted Czech to testify regarding "civil adjustments" and "civil computations." (Mem. in Supp. of Mot. for J. of Acquittal 7-8, ECF No. 192-1.) Defense counsel made this argument repeatedly at trial, and the court still struggles to understand the argument. Czech testified that her work for the IRS normally consists of performing audits on taxpayers to determine whether they owe additional taxes. She performed the same kind of review and calculations in this case that she would have performed if she were conducting an audit. She was properly permitted to testify about those calculations. Defense counsel fails to explain how the calculations would be any different in a civil case than in this criminal case. The key difference between a civil case alleging failure to report income and a criminal case alleging failure to report income is the defendant's state of mind. That was a matter for the jury to decide. Czech did not opine as to Pomrenke's willfulness or whether she knowingly made false statements to the Social Security Administration. Had the jury concluded that Pomrenke lacked the required mens rea as to some or all of the tax-related charges, it could have determined on its own which items on Czech's

spreadsheet it should disregard. Pomrenke's arguments regarding civil adjustments and calculations are unpersuasive.

Fourth, Pomrenke argues that Czech was not a proper summary witness because she was not present in the courtroom during the testimony of all the other witnesses. The Federal Rules of Evidence allow a witness to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The documents on which Czech based her calculations were BVU business records that were available to the defendant, and defense counsel had ample opportunity during cross-examination to introduce and question the witness about the records she had summarized. *See United States v. Katsipis*, 598 F. App'x. 162, 164-65 (4th Cir. 2015) (unpublished) (noting that while the chart "did not account for all of the confounding variables, [the witness's] acknowledgement of that fact ameliorates the potential for prejudice" and the defendant "had ample opportunity, on cross examination, to highlight the limitations of the chart"). The court has located no binding precedent that would require a witness to sit through an entire trial in order to be permitted to offer a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006.

Fifth, Pomrenke contends that the court erred in allowing the jury "to consider the failure to report service awards, safety awards and retirement awards, below $400, because the government's own witness testified that as controller for the company he advised the defendant that 'cash amounts up to $400 for service and safety awards was not taxable.'" (Mem. in Supp. of Mot. for J. of Acquittal 9, ECF No. 192-1.) There was evidence that Boothe gave Pomrenke this legally erroneous advice, which was relevant to the issue of Pomrenke's mental state in failing to report these payments. However, the jury was correctly instructed that cash payments by an employer to its employees are always considered taxable income. *See United States v. Jinwright*, 683 F.3d 471, 481 (4th Cir. 2012) (stating that "payments from an employer to an employee are not gifts, but are presumed to be included in gross income"). The jury was entitled to consider all of the evidence, including Boothe's advice, when deciding whether Pomrenke submitted W-2 forms to the Social Security Administration knowing that they should have reported these cash payments but did not. The government is not precluded from relying on the failure to report these cash payments simply because at one point, Boothe gave Pomrenke bad advice, and the government then called Boothe as a witness in this case.

I find no error in the admission of Czech's testimony, and therefore I decline to grant a new trial based on her opinions, calculations, or exhibits.

### 5. Exclusion of Certain Opinions of Defense Expert.

Pomrenke also seeks a new trial on the ground that the court precluded her expert witness, John Merrell, from testifying that (1) it was acceptable for BVU to report employee fringe benefits on 1099 forms rather than W-2 forms, and (2) tax law is complex and uncertain. My reason for excluding Merrell's opinion regarding the use of 1099 forms was that the evidence showed that most of the benefits at issue in this case were never reported on 1099s or W-2s. There was testimony that for a period of time, BVU issued employees 1099 forms for vehicle allowances. However, several witnesses testified that 1099 forms should be used only for independent contractors, not for employers, and that the advantage of reporting benefits on 1099 forms is that the employer does not withhold taxes from payments reported on 1099 forms. Merrell himself conceded that it would have been preferable for BVU to report fringe benefits on employees' W-2s rather than on 1099s. If permitted, Merrell would have testified that other companies have improperly used 1099s to report employee compensation with the IRS's knowledge, and the IRS did not take legal action, whether criminal or civil, against those other companies. That testimony, reflecting little more than prosecutorial discretion, would have been irrelevant to the charges against Pomrenke and would have served no purpose other than to confuse the jury.

Merrell's proposed testimony about the complexities of tax law was also irrelevant and served only to confuse the jury. The tax laws at issue in this case were fairly straightforward, and I instructed the jury as to what the law required. The evidence here showed that Pomrenke repeatedly received advice that she refused to follow. On several occasions, she was made aware of BVU's obligation to report all employee compensation, including cash, pre-paid debit cards, and personal use of BVU vehicles. She failed to heed those warnings. A generic opinion regarding how complex tax law is would not have assisted the jury in ascertaining Pomrenke's state of mind. I find no error in the exclusion of Merrell's proposed testimony.

### 6. Jury Instruction Regarding Official Action.

Finally, Pomrenke argues that she is entitled to a new trial because the jury instructions did not define "official action" in a way that complied with the Supreme Court's decision in *McDonnell*. I instructed the jury that "official action" means "any decision or action on any question, which may at any time be pending, or which may be brought before a public official, in the public official's official capacity." I further instructed the jury that "an officer of BVU is a 'public official.'" (Jury Instr. 30-31, ECF No. 137.) I gave these instructions while instructing the jury on the extortion counts and did not later restate the definition of "official action" in my instructions regarding the other counts.

In the *McDonnell* case,

> the District Court instructed the jury that to convict Governor McDonnell it must find that he agreed "to accept a thing of value in exchange for official action." The court described the five alleged "official acts" set forth in the indictment, which involved arranging meetings, hosting events, and contacting other government officials. The court then quoted the statutory definition of "official act," and — as the Government had requested — advised the jury that the term encompassed "acts that a public official customarily performs," including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end."

> Governor McDonnell had requested the court to further instruct the jury that the "fact that an activity is a routine activity, or a 'settled practice,' of an office-holder does not alone make it an 'official act,'" and that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official," because they "are not decisions on matters pending before the government." He also asked the court to explain to the jury that an "official act" must intend to or "in fact influence a specific official decision the government actually makes — such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation." The District Court declined to give Governor McDonnell's proposed instruction to the jury.

136 S. Ct. at 2366 (citations omitted).

The Supreme Court found the district court's instructions inadequate for three reasons. "First, the instructions did not adequately explain to the jury how to identify the 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 2374. The Court explained, "The testimony at trial described how Governor McDonnell set up meetings, contacted other officials, and hosted events. It is possible the jury thought that a typical meeting, call, or event was itself a "question, matter, cause,

135

suit, proceeding or controversy." *Id.* "To prevent this problem, the District Court should have instructed the jury that it must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power." *Id.*

"Second, the instructions did not inform the jury that the 'question, matter, cause, suit, proceeding or controversy' must be more specific and focused than a broad policy objective." *Id.* This criticism stemmed largely from the fact that the evidence and argument before the jury implied that the relevant "'question, matter, cause, suit, proceeding or controversy' was something as nebulous as 'Virginia business and economic development.'" *Id.* (citation omitted). The district court should have clarified "that the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the question whether to initiate the research studies." *Id.*

"Third, the District Court did not instruct the jury that to convict Governor McDonnell, it had to find that he made a decision or took an action — or agreed to do so — *on* the identified 'question, matter, cause, suit, proceeding or controversy' . . . ." *Id.* Based on the evidence presented, the Court found that the jury might have convicted McDonnell based solely on an agreement to have his subordinates attend a meeting, "without finding that he agreed to make a decision or take an

136

action on a properly defined 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 2375.

The problems present in the *McDonnell* case are not present here. The evidence presented at trial, when compared with the counts charged in the Indictment, clearly indicates that the "official actions" alleged by the government were the awarding and maintenance of BVU contracts. Counts Ten through Fifteen of the Indictment, charging honest services wire fraud, specifically allege that in exchange for receiving things of value, Pomrenke intended to "misuse her position as Chief Financial Officer of BVU to manipulate and influence BVU's awarding of lucrative contracts." (Indictment 20, ECF No. 2.) The Indictment did not identify any other "question, matter, cause, suit, proceeding or controversy" or "official action" in support of the honest services wire fraud counts. *See McDonnell*, 136 S. Ct. at 2373-74. The only way the jury could have convicted Pomrenke of the five charged counts of honest services wire fraud was if the jury concluded that the "question" addressed by each count was the contract associated with the named vendor that was pending during the stated time period or that may have been brought before Pomrenke in her official capacity. (*See* Jury Instr. 30-31, ECF No. 137.) The instructions also specifically stated that "official action" requires a "decision or action" on the question that is pending or may be brought. (*Id.*) In short, the instructions in this case, combined with the charges in the

Indictment, made clear to the jury that the alleged "official actions" were the decisions by Pomrenke and her co-conspirators on the "questions" of whom would be awarded BVU contracts. This was the only theory the government presented on the honest services wire fraud charges.

While the instructions regarding official action were included in the discussion of the extortion counts, they followed an explanation of the "quid pro quo" requirement in which I explained that "the government must prove a quid pro quo, or an exchange of 'this for that.'" (*Id.* at 30.) I then explained that "[t]he government need only show that a public official has obtained a wrongful payment knowing that the payment was made in return for official acts." *Id.* A few sentences later, I defined "official action" as discussed above.

When I instructed the jury on the program bribery count, I did not restate the definition of official action, but I explained that "[w]hat the government must prove is that the defendant solicited or accepted the thing of value, at least in part, intending to be influenced or rewarded in connection with the performance of official action." (*Id.* at 34.)

When I instructed the jury on the honest services wire fraud counts, I explained that the government was required to prove beyond a reasonable doubt that Pomrenke "knowingly devised or knowingly participated in a scheme to defraud the public of its right to the honest services of a public official through

138

bribery, as charged in the Indictment." (*Id.* at 37.)  In my instruction on program bribery, I stated that "the government must prove a quid pro quo, that is, that the defendant solicited, demanded, accepted, or agreed to accept a thing of value in return for a specific exercise of her official power, commonly known as a 'bribe.'" (*Id.* at 33.)  I further explained that the government was required to prove that Pomrenke solicited or accepted the thing of value with the intent "to be influenced or rewarded in connection with the performance of official action," which had of course already been defined.  (*Id.* at 34.)  As I only provided the jury one definition of "bribe" and one definition of "official action," I conclude that the jury understood that those definitions applied to those terms wherever they were used throughout the instructions.

After thoroughly reviewing the evidence, instructions, and governing precedent, I find that unlike in the *McDonnell* case, there is no possibility here that Pomrenke was convicted "for conduct that is not unlawful."  *McDonnell*, 136 S. Ct. at 2375.  For that reason, I conclude that the *McDonnell* case and the jury instructions given in this case do not warrant a new trial.

IV.

Conclusion.

For the foregoing reasons, it is **ORDERED** as follows:

139

1.     The Motion to Extend the Time to File a Motion for a New Trial (ECF No. 195) is DENIED;

2.     The Motion to Extend the Time to File a Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure—Tax Counts (ECF No. 196) is GRANTED, to the extent that the motion asserts grounds for a judgment of acquittal;

3.     The Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure (ECF No. 188) is DENIED;

4.     The Motion for a New Trial (ECF No. 190) is DENIED;

5.     The Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure—Tax Counts (ECF No. 192) is DENIED; and

6.     The Motion for New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure —Tax Counts (ECF No. 193) is DENIED.


ENTER:  August 1, 2016

/s/  James P. Jones_____
United States District Judge